**NEW ENGLAND DAIRIES, Inc., v. WICKARD, Secretary of Agriculture.**

No. 342.

Circuit Court of Appeals, Second Circuit.

July 18, 1944.

J. Stephen Doyle, Jr., and W. Carroll Hunter, Sp. Assts. to Atty. Gen., and Katherine A. Markwell and Clarence H. Girard, Attys., Department of Agriculture, both of Washington, D. C., Wendell Berge, Asst. Atty. Gen., and Joseph A. McNamara, U. S. Atty., of Burlington, Vt., for appellant.

A. Pearley Feen, of Burlington, Vt., for appellee.

Before L. HAND, SWAN, and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

The defendant appeals from a judgment relieving the plaintiff of the obligation of an order made by him, directing it to make certain payments which he found to have been due under an order, promulgated on February 7, 1936, which we shall speak of as Order No. 4. The defendant made this order by virtue of the power granted him by § 8c(1) of the Agricultural Adjustment Act of 1933, 7 U.S.C.A. § 608c(1), and after the notice and hearing prescribed in § 8c(3). Nobody questions its validity, and we shall take it as having the force of law; we are concerned only with its interpretation. It applied to the "handling of milk in the Greater Boston, Massachusetts, Marketing Area," and imposed certain duties upon "handlers" of milk and milk products in favor of "producers": i.e. farmers, designed to support the price of milk, and to secure its uniformity among "producers". It required "handlers" to make reports of all sales made by them, and to pay to "producers" sums computed by an official, called a "Market Administrator." Besides these, "handlers" must make contributions to the "Producers Settlement Fund," out of which

the "Market Administrator" distributes to "producers" payments to make the price of milk uniform within the area. This was the general scheme, and the question at issue is whether Order No. 4 imposed upon the plaintiff a duty to make the payments directed by the order here under review. The facts were as follows.

The Burlington Cooperative Milk Products Company, (which we shall speak of as "Products"), was a Vermont cooperative marketing association, incorporated in that state in 1918; it issued shares to ten shareholders who were milk farmers in the neighborhood of Burlington, and it sold their milk in that city exclusively. In June, 1934, other milk farmers, also in the vicinity of Burlington, incorporated another cooperative association as a stock company—the Burlington Cooperative Creamery Association—(which we shall speak of as "Creamery.") The plaintiff is also a milk farmers' cooperative, incorporated in Vermont in 1931, but doing business in Boston; it acts "as a central marketing agency" for its members, who until May 1937, were themselves all cooperative associations of milk farmers, but who since that time have included some farmers, who deliver to its plants in the "New England Milk Shed," of which it operates a "substantial number." In 1935 "Creamery" became a member of the plaintiff by a contract making it "Creamery's" selling agent; the substance of this contract, so far as is relevant to this controversy, will appear later.

The relations between "Products" and "Creamery," from which the Secretary concluded that the plaintiff was liable under Order No. 4 for the payments here in suit, appear in his 22nd finding made after the hearing which we shall mention. Since we think that this finding is supported by substantial evidence and must be accepted, and since it is sufficiently succinct, we quote it verbatim:

"Both Burlington Cooperative Creamery Association, Inc., and Burlington Cooperative Milk Products Co., Inc., are engaged in receiving milk from producers and marketing the same under the supervision of the same general manager. Both corporations do business in a plant owned by Farmers' Realty Company, Inc., a corporation organized under the laws of Vermont and having its principal place of business at Burlington, Vermont. The members of both corporations deliver their milk at said plant and when the milk is received at the plant it is deposited in the same tanks and so intermingled that thereafter it is impossible to separate the milk belonging to one corporation from that belonging to the other. The said Burlington Milk Products Co., Inc., performs all of the physical handling services of the milk of both corporations. Burlington Cooperative Creamery Association, Inc., pays the Burlington Cooperative Milk Products Co., Inc., for the handling services the sum of 15 cents per hundred pounds. New England Dairies, Inc., pays Burlington Cooperative Creamery Association, Inc., the sum of 23 cents per hundred pounds, which nets it 8 cents profit, on the handling of each hundred pounds. The milk of both corporations is sold by the same general manager. The books and accounts of each corporation are kept separately. Each corporation keeps a separate bank account and draws separate checks to its members. The business of both companies is so handled that it becomes a matter of bookkeeping only. The Burlington Cooperative Creamery Association, Inc., makes savings in the handling charges which are returned to the producers of that association in the form of bonus payments. The Burlington Cooperative Milk Products Co., Inc., has an income from the sale of skim milk. Taking these earnings into consideration, the sales are so handled that the members of each corporation receive the same prices for the same grades of milk."

To this we need only add that, although "Creamery" normally delivers all its milk to the plaintiff who ships it to the Boston "area," and, although "Products" sells all its milk in Burlington, at times the amount of milk sold in Burlington by "Products" is more than its members have delivered to it. This can happen because, as appears in the finding, the milk of both companies is dumped into common tanks and becomes indistinguishably mingled. To cover these instances the accounts are set up as though "Products" had bought the excess milk from the plaintiff, as "Creamery's" selling agent; the plaintiff credits the milk to "Creamery," and reports them to the "Market Administrator" as part of the milk sold for its members. They do not, however, figure in the amounts that are the subject of this action. The liability for these arose in the following way.

On July 3, 1939, the Market Administrator billed the plaintiff for $9,914.08 due to the "Producers' Settlement Fund," and $514.36 due to the "Administration Fund"

—the fund collected to disburse the expenses of administration of the system. This was upon the theory that all milk received and handled by "Products"—which had not been bought in the way just mentioned, from "Creamery"—was milk "handled" by the plaintiff within the meaning of Order No. 4. This ruling the plaintiff contested, and petitioned the Secretary—as provided by the Act—to relieve it of the amounts so assessed. The Secretary granted a hearing, some testimony was taken, and the other evidence was stipulated. After the case had been submitted by both sides, the Under Secretary, acting for the Secretary, filed a report with findings and conclusions, as required by § 8c(4), in which he upheld the position of the "Market Administrator." Thereupon the plaintiff filed a complaint in the District Court of Vermont under § 8c(15) (B) to set aside the Secretary's order, which came on to be heard upon the evidence taken at the hearing. The judge concluded that the order was "not in accordance with law," set it aside, directed that the accounts with the "Market Administrator" should be readjusted by the elimination of the two items in question, relieved the plaintiff from any obligation to pay them, and directed the Secretary to direct the "Market Administrator" to pay the plaintiff any sums which had been withheld because of the order. The defendant then appealed.

Section one of Article V of Order No. 4 provides that "each handler shall * * * with respect to milk or cream which was * * * (a) received from producers, (b) received from handlers or (c) produced by such handler, report to the Market Administrator * * * 2. The receipts at each plant from any other handler." We are concerned here only with milk received from handlers, because neither "Products," nor "Creamery" were producers. Section 1 of Article VII directs the "Market Administrator" to "compute * * * the value of milk sold or used by each handler which was not purchased from other handlers." Obviously, the administrator can make such a computation only from the reports he receives. The sum so computed § 1 of Article VIII requires a handler, in part to pay direct to producers, and in part to pay to the "Market Administrator" for the "Producers' Settlement Fund" (§ 1(5) Article VIII). These payments are to be made only upon "milk received during said delivery period * * * to be computed pursuant to section 1 of Article VII;"

which, as we have just seen, covers only milk "sold or used" by the handler. We cannot understand how it is possible to say that the milk sold in Burlington by "Products" was, either "received" by the plaintiff within Article VIII, or "sold or used" by it within Article VII. Nor do we see how the plaintiff could be expected to report under Article V, as "receipts" at any of its plants, milk which "Products" sold at Burlington from the Burlington plant, which it held under lease and which was in no sense a plant of the plaintiff. It makes not the slightest difference whether or not "Products" and "Creamery" were only colorably separated, or whether their businesses were a single business for the purposes of Order No. 4. The result would be the same, had there been no "Products," and had "Creamery" sold part of its milk in Burlington without the intervention or agency of the plaintiff, and the rest under its contract with the plaintiff. Even assuming that what it sold on its own account would in that case have been within Order No. 4, and that it might be liable for the charges upon it, the plaintiff's liability would have been confined to the milk which it received. To impose upon the plaintiff an obligation for the milk which "Creamery" "sold or used," and for which it might be liable, would be flatly in the face of Article XII of Order No. 4, which provides that "no handler shall be liable for the default of any other handler."

Possibly the Secretary has power to impose liability upon any handler, who receives any part of the milk from another handler, for all the milk "sold or used" by that handler. That would, it is true, compel all handlers who chose to market any of the milk for other handlers, to supervise all the marketing of those handlers; but we need not decide that that would have been beyond the Secretary's power. However, such a liability would be far more onerous than the liability for only that milk which the reporting handler himself receives at his plant, and for the charges upon what he himself sells or uses. At least if the power extends to such a drastic liability, certainly its exercise should be in the clearest words, and the order exercising it should not contain anything like Article XII.

Moreover, when we come to the administration expenses, this result is perhaps even clearer. A handler need pay these only upon milk "actually delivered to him." No milk sold by "Products" can by the ex-

tremest stretch be said to have been "actually delivered" to the plaintiff. Indeed, if the language of § 1 of Article X be followed literally—we do not suggest that it must be—administration expenses are chargeable to a handler only upon milk delivered to him by a "producer," and none of the milk received by the plaintiff came from "producers" except that part which came to it direct, after it began to accept producers as members in 1937. The argument must be that "Products" was liable for administration expenses upon milk delivered to it by its own producers; that through its relations with "Creamery," "Creamery" was jointly liable with it; and that the plaintiff became liable as handler for "Creamery." There is only one conceivable theory on which to impose such a liability upon the plaintiff. It would not be enough to assume—as we are assuming—that for practical purposes "Products" and "Creamery" are one; and—so far as concerns administration expenses—that milk received from an association of producers is milk "actually received" from "producers." We should have to go further and assume, not only that the plaintiff knew enough of the relations between "Products" and "Creamery" to be charged with notice that they were one; but that it was also privy to a scheme by which they should collectively divert from the plaintiff milk which otherwise it would have marketed under its contract with "Creamery". There is not a syllable in the record to support such a conclusion, nor did the findings of the Under Secretary suggest anything of the kind. All we know about the plaintiff's relations with either "Products" or "Creamery" is that "Products" on occasion did buy milk of the plaintiff, and that "Creamery" was one of its members. Even though we charge the plaintiff with knowledge that the milk was poured into common vats, that would not be enough, though apparently at the outset the "Market Administrator" thought that it was. Such physical mixtures are like the mixtures of wheat in a common bin; the owners keep their property, though it becomes an aliquot share of a common mass. That alone could not charge the plaintiff with notice of a scheme—if there was any such scheme—by which "Products" and "Creamery" were trying to evade their duties, or compel the plaintiff to follow the course of milk, which it never itself received, or sold, or used.

Nor does the contract between the plaintiff and "Creamery" change this result. Clearly it did not make the plaintiff liable for any charges which the order might impose upon "Creamery" because of "Creamery's" "default"; indeed, the defendant in his brief does not argue that it does. It constituted the plaintiff the "sole and exclusive agent for the sale, or marketing or other disposition of all the milk and cream subject to its control." "Creamery" "designates" the plaintiff "as its agent to handle for it and on its behalf any or all milk or milk products." It agrees that the plaintiff should "be empowered to deduct from the proceeds of the sale of all milk * * * such sums as are necessary to cover the operating expenses" of the plaintiff. The plaintiff agrees to "adopt * * * a plan for the equalization of sales of all milk * * * and the proration of receipts therefor among Member Associations with adjustments for differences in grade" etc. These are the only stipulations which can by any possibility be thought relevant, and it is apparent at once that by them the plaintiff did not promise to pay any obligations which might be imposed upon "Creamery" under Order No. 4.

Judgment affirmed.