## SHAWANGUNK COOPERATIVE DAIRIES, Inc., v. JONES et al.

### No. 181.

Circuit Court of Appeals, Second Circuit.

Feb. 11, 1946.

---

[9] 14 Tex.Jur. 916, 917.

Samuel Rudykoff, Asst. U. S. Atty., of New York City (John F. X. McGohey, U. S. Atty., of New York City, on the brief), for defendants-appellants.

Edward L. Cole, of New York City, for plaintiff-appellee.

Before SWAN, CHASE and CLARK, Circuit Judges.

CLARK, Circuit Judge.

This case presents for review the questions (1) whether the plaintiff was properly ruled a "handler," within the meaning of § 927.1(f) of Order No. 27 governing the marketing of milk in the New York Metropolitan Marketing Area, as to certain milk which it was receiving gratuitously at its plant for a handler whose plant had been closed, and, if so, (2) whether the Order so interpreted was authorized by the statute upon which it was based, the Agricultural Marketing Agreement Act of 1937, § 8c, 7 U.S.C.A. § 608c. The Market Administrator required payment from plaintiff for the milk in question in the amount of $1,940.33 as its obligation to the funds for producer settlement and for administration under the Order. Plaintiff paid the assessment under protest and then petitioned for a review of the ruling by the War Food Administrator, to whom the authority vested by the Act in the Secretary of Agriculture had been transferred by Executive Order No. 9322, March 23, as amended 50 U.S.C.A. Appendix § 601 note, pursuant to the First and Second War Powers Acts of 1941, 50 U.S. C.A. Appendix § 601 et seq., and 1942, 50 U.S.C.A. Appendix § 631 et seq. After due hearing the Administrator denied the petition, making findings of fact and conclusions of law. In re Shawangunk Cooperative Dairies, Inc., Agric. Dec., No. 850. Plaintiff then brought this action for review as authorized by § 8c (15) of the Act, accepting the findings, but not the conclusions, of the Food Administrator. The District Court found the ruling invalid and set it aside, remanding the proceedings to the Administrator with an opinion interpreting Order No. 27 as applicable only to "a proprietory handler which had acquired the milk from a producer for marketing," and not to "a mere gratuitous temporary bailee." D.C., 59 F.Supp. 848, 852. From this decision the War Food Administrator and the Secretary of Agriculture appeal.

The facts are somewhat unusual. Until approximately May 8, 1941, Meadow Valley Farms, Inc., a corporate handler, was operating an approved plant at New Paltz, New York, about fourteen miles from the plaintiff's plant at Kyserike, New York. At that time Meadow Valley ceased to operate its plant; but, in order that the approximately fifty producers who had formerly delivered their milk to it might maintain an entrance to the marketing area, it arranged for delivery of their milk to the plant of plaintiff, a co-operative association of producers of milk and a handler under the Act and Order. The milk was deposited at a platform in New Paltz, whence Meadow Valley provided transportation to Kyserike. Plaintiff then sent the milk out for pasteurization to its own contractee and, on completion of the process, returned it to

Meadow Valley. The arrangement having been represented to the War Food Administrator as purely temporary, he accepted Meadow Valley's reports on the milk through August, 1941. It then became evident that Meadow Valley would not establish a plant at New Paltz, and therefore the Administrator made the assessments here in dispute against plaintiff for the months of September through December, 1941.

The New York Milk Marketing Order has been often considered in the cases. Among these, United States v. Rock Royal Co-op., 307 U.S. 533, 59 S.Ct. 993, 83 L. Ed. 1446; Queensboro Farm Products v. Wickard, 2 Cir., 137 F.2d 969; and Waddington Milk Co. v. Wickard, 2 Cir., 140 F. 2d 97, in particular consider the purpose and method of operation of the Order.[1] Thus in the Waddington case, after pointing out the conditions of milk production and distribution and the purpose of the Act to procure a greater share of the return for the farmer-producer, we turned to the method utilized in the Order of determining the classification and pricing of the milk. We said: "Given the conditions and the purpose, there appears to be nothing unreasonable in selecting as the controlling point for determination of the form in which milk is to be classified for the fixing of wholesale prices the time when it leaves the initial receiving plant of the distributor." And we added: "The order is complicated and detailed; certainly it appears more likely to achieve fairness in the greater number of cases than any we can think of or suggest. We are clear that it results in no unfair discrimination among handlers here. Indeed to an unusual degree, considering the complications of the industry, equality of opportunity to operate and of operation is preserved by it." 140 F.2d at pages 101, 102. Hence there, as in the Queensboro case, we upheld the Order classifying the milk in accordance with the form in which it is held

at, or moved from, the handler's plant. And our decision in New England Dairies v. Wickard, 2 Cir., 144 F.2d 460, recognized and supported this view as to milk in bulk neither received by a handler nor destined for the regulated milk market.

■ This concept of the handler at the initial receiving plant as the unit about which the entire administrative regulation revolves is carried out definitely in the Order itself. Thus "handler" is defined as "any person who engages in the handling of milk, or cream, or milk products therefrom, which milk was received at a plant approved by any health authority for the receiving of milk to be sold in the marketing area, which handling is in the current of interstate commerce or directly burdens, obstructs, or affects interstate commerce." 7 CFR, Cum.Supp., § 927.1(f).[2] And a "producer" is defined as "any person who produces milk which is delivered to a handler at a plant which is approved by any health authority for the receiving of milk to be sold in the marketing area." 7 CFR, Cum. Supp., § 927.1(e). Later provisions, e.g., §§ 927.3—927.8, carry out the system described in the Rock Royal case, 307 U.S. 533, 551–555, 562–568, 571, 572, 578–581, 59 S.Ct. 993, 83 L.Ed. 1446. The general purpose is to provide for uniform prices, subject to transportation and location differentials, to the milk producers for the fluid milk they sell, while the handlers make final settlement on the basis of the utilization they make of it, depending on variation in the butterfat content or other factors affecting the use of milk. This equalization is worked out through a producer-settlement fund, to which the handler makes payment, or from which he is paid each month, as his payments to producers at the uniform price determined by the Market Administrator may have left a debit or credit balance on the amounts accredited to him for his milk when duly classified in the manner stated above.

---

[1] See, in addition to cases cited below, New York State Guernsey Breeders' Co-op. v. Wickard, 2 Cir., 141 F.2d 805, 153 A.L.R. 1165, certiorari denied 323 U.S. 725, 65 S.Ct. 58; United States v. Adler's Creamery, 2 Cir., 107 F.2d 987, id., 2 Cir., 110 F.2d 482, certiorari denied Adler's Creamery v. United States, 311 U.S. 657, 61 S.Ct. 12, 85 L.Ed. 421; and the cases involving the Boston Milk Marketing Order, Stark v. Wickard, 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733; and H. P. Hood & Sons v. United States, 307 U.S. 588, 59 S.Ct. 1019, 83 L.Ed. 1478.

[2] A second sentence includes a co-operative association of producers "with respect to any milk received from producers" at an approved plant or milk delivered for it by producers to any other handler for its account and for which it receives payment. The fact that it was thus necessary to provide specially for a co-operative which received payment for milk actually handled by another re-enforces the necessity for handling at an approved plant before other handlers may be recognized as such under the Order.

To carry out the scheme the handler is required to make definite reports to the Market Administrator by the 10th of each month as to the milk received from producers, or from other handlers, together with his utilization thereof,[3] and an estimate of his obligation to the producer-settlement fund, based on the minimum class prices provided for in the Order. On the basis of the reports of the handlers, the Administrator sets his uniform price to producers for the month and notifies the handlers of their pool obligations which are to be settled by payment to or from them, as the case requires, by the 18th, with payment to the producers by the 25th. Other provisions include requirements of payment of the administration expenses by the handler and payment to the producer of any adjustments required by the Administrator on examining the reports submitted.

Thus it is clear that the Secretary of Agriculture, in promulgating the Order, has devised as simple and effective a scheme of controlling and auditing the marketing operations as the general purpose of the Act and the difficulties of milk marketing permit. A receiving plant approved by the proper health authorities is a quite definite thing, and milk taken in at it is subject to at least some administrative check and control. Further, it is clear that if the system is caused to break down in any of its links—if some milk is to be accounted for other than through this device of the handler's plant—the Secretary's plan is, to that extent, frustrated; and any substantial variation will make the plan unworkable as a whole. Then would arise indeed a difficult problem as to what could or should be substituted in its place. The decision below makes a definite, even if small, lacuna in the operation of the Order. Since Meadow Valley's plant is closed, it cannot be held as a handler under the Order. Cf. Vogt's Dairies v. Wickard, D.C.S.D.N.Y., 45 F.Supp. 94. If plaintiff is not the handler, the milk here must stand unregulated, with serious consequences to the producers who are dependent upon the operation of the Order for payments at uniform prices with other producers. And a revamping of the Order to include Meadow Valley as a handler would entail difficulties beyond the not inconsiderable ones of adjustment of the many conflicting interests affected by any amendment. For it would require some new test different from the simple one of receipt at an approved plant, perhaps some idea of legal title or temporary legal ownership, involving almost insuperable problems for the Market Administrator in administering the Order. These seem technical legal questions quite extraneous to the central scheme of measuring the flow of milk from producer to New York City consumer for the purpose of requiring a greater return from the middleman to the producer. Compare Elm Spring Farm v. United States, 1 Cir., 127 F.2d 920, and United States v. Corinth Creamery, D. C.Vt., 21 F.Supp. 265, cutting through various manipulations of title to hold the distributors in question to be handlers under the Act.

█ On the other hand, there seems little difficulty, either of legal rationalization or of practical operation, in holding the plaintiff a handler within the definition of the Order. It receives the milk at an approved plant, and is thus easily subject to administrative supervision. True, it must ascertain (from Meadow Valley or directly from the producers) who the producers are and what each has delivered, in order to report to the Administrator; but this is not more difficult or more extensive than the reporting otherwise required of it under § 927.5. It contends that it cannot be held a handler, since it was not the owner, but only a bailee. But there is no requirement in the Order of legal ownership, and the Rock Royal case definitely upheld the application of the Order to an agent. The court below stressed that plaintiff was a *gratuitous* bailee, but again the operation of the Order is nowhere conditioned upon the payment of consideration. Nor should the Administrator be required to determine such extrinsic problems before he can apply the regulation to a handler ostensibly receiving milk at his plant.

Finally much stress was made below and here upon the necessity of some direct relation between producer and handler, such as a direct purchase by an individual handler from an individual producer. This is not stated in this explicit form in the Order; and the general organization of the Order, substituting payments at a uniform price, worked out through the machinery of an equalization pool built up from contri-

---

[3] When classification is made at a *second* plant—as is permitted in certain circumstances, discussed in the Queensboro case, supra—there must be included a statement of classification from the second handler.

butions from all handlers, for the old personal relation of farmer and milkman, the continued use of the passive voice suggesting the general flow of milk to the market, rather than individualized 'bargaining,[4] and the provisions for purchasing and for reporting milk received from others than producers, §§ 927.4, 927.5(1)—all suggest objections to so restricted an interpretation. But even if required, it is certainly obvious that a producer may act through an agent, and need not personally move his milk up to the plant. And here Meadow Valley does not, as of old, merely buy milk from the farmer to dispose of it at will; it must definitely put the milk into the stream of regulation so that the necessary computations and adjustments are made which guarantee to each producer the uniform price received by all other producers. Under this scheme, getting the milk into the classification scheme is more important than the person of the handler. Hence Meadow Valley is to be regarded as the producer's agent to deliver the milk to a handler who is subject to the regulations of the Order.

■ Nor do we think that the Order as thus construed goes beyond the terms of the governing statute. Plaintiff points out that the statute, unlike the regulation, in prescribing the terms of milk orders, uses the words "purchased from producers" and "purchased by handlers." 7 U.S.C.A. § 608c (5) (A,C,D,E). But since the Rock Royal case, supra, determined that the word "purchased" was not to be literally construed, but was to read as the equivalent of the alternative statutory phrase "acquired for marketing," and since the "acquired" of the statute can mean no more than the "received" of the regulation, plaintiff's contention is reduced to its claim that it did not acquire the milk *for marketing*. With this, however, we cannot agree, for, since no milk can enter the New York market without prior reception at an approved plant, plaintiff's acts here were indispensable to the total routing of the milk from the farms of the producers to its destination in New York City.

In view of this interpretation of the Act, the objections made to the regulation and repeated here as pointing also to statutory requirements—the necessity of a legal title, of a proprietory interest as distinguished from that of a gratuitous bailee, and of a

more personal relation between individual handler and producer—all fall as irrelevant. We think the Order was properly construed by the War Food Administrator and, as construed, is legal. If there were need, reference might also be made to the settled construction of the administrative agency itself. Roland Electrical Co. v. Walling, 66 S.Ct. 413; Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161.

Judgment reversed for dismissal of the action.

---

[4] Compare § 927.1(e), quoted above—"who produces milk *which is delivered*," etc.