**KASS v. BRANNAN, Secretary of Agriculture.**

No. 48, Docket 21966.

United States Court of Appeals, Second Circuit.

Argued Dec. 5, 1951.

Decided April 30, 1952.

L. Hand, Circuit Judge, dissented.

Harry Polikoff and Guggenheimer & Untermyer, all of New York City (Munder, Weissman & Lockwood, Huntington, N. Y., of counsel), for appellant.

J. Stephen Doyle, Jr., and Neil Brooks, Special Assts. to the Atty. Gen., Donald A. Campbell, U. S. Department of Agriculture, Washington, D. C., Frank J. Parker, U. S. Atty., and Morris K. Siegel, Chief Asst. U. S. Atty., Brooklyn, N. Y., for appellee.

Seward A. Miller, New York City (Frank B. Lent, New York City, of counsel), for

five organizations appearing as amici curiae.

Before SWAN, Chief Judge, and L. HAND and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Chief Judge.

This is an appeal by the plaintiff from a summary judgment dismissing his complaint in an action brought against the Secretary of Agriculture to recover payments, made under protest, pursuant to provisions of Order No. 27, as amended, regulating the handling of milk in the New York milk marketing area. The plaintiff is a small milk dealer in Lindenhurst, Suffolk County, N. Y. As such he is a "handler" of milk as defined in § 927.1(g) of the Order. The payments he seeks to recover were exacted by the market administrator under § 927.9(h) of the Order with respect to cream and plain condensed milk purchased by the plaintiff from a plant in Orrville, Ohio, and resold within the New York area to small establishments for use in manufacturing ice cream. The plaintiff has permission under license from the New York State Health Department and from health authorities of Nassau and Suffolk Counties to import cream and condensed milk from Orrville, Ohio, provided such milk products are used for manufacturing purposes only. He first sought administrative relief, as required by 7 U.S.C.A. § 608c(15) (A). The hearing examiner filed a report recommending that the provisions under attack be declared "not in accordance with law" because (1) the payments required were in violation of the Agricultural Marketing Agreement Act of 1937, 7 U.S.C.A. § 608c(5) (G), and (2) with respect to condensed milk, the provision, until its later amendment on October 1, 1946, was void for lack of notice in the promulgation hearing. Upon review of the examiner's recommendations the Judicial Officer of the Department of Agriculture refused to adopt them and ruled that the payments required of the plaintiff were legally exacted.[1] The present action was brought pursuant to 7

1. The Judicial Officer acted for the Secretary of Agriculture pursuant to the authority delegated (10 F.R. 13769) under

the Act of April 4, 1940, 5 U.S.C.A. § 516a et seq.

U.S.C.A. § 608c(15) (B) to obtain judicial review of the ruling of the Judicial Officer. Attached as exhibits to the complaint were the report of the hearing examiner and the decision of the Judicial Officer. The defendant filed an answer demanding that the complaint be dismissed on the merits. Both parties moved for summary judgment on the pleadings. The defendant's motion was granted. From the judgment dismissing the complaint the plaintiff has appealed.

Before discussing the legal questions presented by the appeal, a brief reference to the history of federal milk regulation in the New York area may be useful. The Agricultural Marketing Agreement Act of 1937, 7 U.S.C.A. § 601 et seq., reenacted, amended and supplemented previous legislation; it empowers the Secretary of Agriculture to promulgate, *inter alia*, milk orders.[2] Order No. 27 for the New York metropolitan marketing area went into effect September 1, 1938. Extensive amendments, among which are the provisions challenged by the present action, became effective August 1, 1945. They established a new plan of regulating the marketing of milk in the New York area. Before these amendments the Order applied its classification, pricing and pooling provisions to all milk that was approved by the health authorities for sale in the metropolitan marketing area.[3] Under this method of regulation it was possible for plants having health authority approval to share in the pool, even though they supplied the marketing area with little or no fluid milk during the season of short supply. A handler operating such a plant could obtain milk for the manufacture of milk products by paying the class price of milk as such—a lower price than the uniform price—and could then obtain from the producer-settlement fund, a credit sufficient to enable him to pay the uniform price to the producers who supplied the milk. This practice had the dual effect of reducing the returns of producers whose milk was regularly distributed as fluid milk in the marketing area, and of providing an inadequate supply of fluid milk in the fall and winter months of low production. To remedy this situation the 1945 amendments were adopted. By § 927.1(f) "producer" was defined to mean any dairy farmer whose milk is delivered direct from a farm to a pool plant, and "pool plant" was defined as any plant which is designated as a pool plant pursuant to § 927.3. Qualification for such designation required either the shipment of, or the ability and willingness to ship, fluid milk to the marketing area. This new plan of regulation based primarily on the handling of milk in pool plants is not challenged by the appellant. His attack is directed to auxiliary provisions, namely § 927.9(h), printed in the margin.[4] In brief these aux-

2. The Act was amended in 1947 and 1948, 7 U.S.C.A. §§ 602, 672, in respects immaterial to the case at bar.

3. The validity of *Order No. 27* was upheld in United States v. Rock Royal Cooperative, Inc., 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446. Various aspects of the Order have previously come before this court. See Dairymen's League Cooperative Ass'n v. Brannan, 2 Cir., 173 F.2d 57, certiorari denied 338 U.S. 825, 70 S.Ct. 73, 94 L.Ed. 501; Grandview Dairy v. Jones, 2 Cir., 157 F.2d 5, certiorari denied 329 U.S. 787, 67 S.Ct. 355, 91 L. Ed. 675; Shawangunk Cooperative Dairies v. Jones, 2 Cir., 153 F.2d 700; Waddington Milk Co. v. Wickard, 2 Cir., 140 F.2d 97; Queensboro Farm Products v. Wickard, 2 Cir., 137 F.2d 969; see also Titusville Dairy Products Co. v. Brannan, 3 Cir., 176 F.2d 332, certiorari denied 338 U.S. 905, 70 S.Ct. 307, 94 L.Ed. 557.

4. This section was originally numbered § 928(e). By amendment effective October 1, 1946, the section was renumbered as § 927.9(h), and a provision was added, § 927.9(h) (2) (iv), changing the amount to be paid during an emergency declared by the market administrator. The section reads as follows:

"§ 927.9(h) Payments for milk or milk products other than producer sources.— (1) Payment shall be made by handlers to producers, through the producer-settlement fund, for milk, cultured or flavored milk drinks, cream, plain condensed milk, or skim milk, which milk and milk product meets each of the following provisions: (i) it was derived from milk received at some plant from dairy farmers (other than the handler operating such plant) who are not producers; (ii) it was received at a plant in, or delivered to a purchaser in the marketing area, or

iliary provisions provide that handlers of non-pool milk and non-pool milk products disposed of in the marketing area are required to make payments to producers, through the producer settlement fund. The purpose of these provisions is, in the words of Mr. Weldon, a witness at the promulgation hearing, "to insure that the minimum cost [of non-pool milk, cream, etc.] to handlers is the same as the regular class price to handlers of milk received at pool plants. * * *" The effect is to add an additional cost to the original price of the non-pool milk or milk product which is paid by the handler, not to the seller or original producer, but to the regular suppliers of the New York market who did not deliver the milk or milk products to him.

The Ohio plant from which the plaintiff purchased cream and plain condensed milk for sale in the New York area to ice cream manufacturers was not a pool plant was received at a pool plant outside the marketing area and assigned either to shipments to the marketing area of milk, cultured or flavored milk drinks, cream, plain condensed milk, or skim milk, or to plant loss; and (iii) the milk or milk equivalent of the butterfat is classified as Class I-A, Class II-A, or Class II-B, or the skim milk is classified as Class V-a.

"(2) The amount of payment for the products set forth in (1) of this paragraph shall be as follows:

"(i) If the milk, or the milk equivalent of the butterfat, or the skim milk is classified and paid for under another order issued pursuant to the act, the amount of payment shall be any plus amount obtained by subtracting the value of the milk, the milk equivalent of the butterfact, or the skim milk at the class price or prices under such other order from the value computed in accordance with the classification and pricing set forth herein.

"(ii) If the milk or milk product is derived from milk the handling of which is not regulated by another order issued pursuant to the act, the amount of payment shall be as follows: for milk, or for cultured or flavored milk drinks containing 3.0 percent butterfat or more, the difference between the value of such milk or cultured or flavored milk drinks at the Class I-A price in the 201–210 mile zone and the value computed at the Class IV-A and Class V-B prices; except as provided in (iv) of this subparagraph, for cream, plain condensed milk, or for cultured or flavored milk drinks containing less than 3.0 percent butterfat, the difference between the value of the milk equivalent of such cream, plain condensed milk, or milk drinks at the appropriate class (II-A or II-B) price in the 201–210 mile zone and at the Class IV-A price (milk equivalent in each case to be computed on the basis of milk containing 3.5 percent butterfat); and for skim milk (either as skim milk or in cultured or flavored milk drinks), the difference between the value computed at the Class V-A price in the 201–210 mile zone and the Class V-B price.

"(iii) In the event that the source of such milk or milk product is not revealed, the amount of payment shall be the full value at the class prices in the 201–210 mile zone.

"(iv) If the market administrator finds that there is an inadequate supply of cream or plain condensed milk in the marketing area and that such products are available from nonpool sources, he may declare an emergency for a period ending not more than three months from the date of such declaration, in which case the payment during the period of such declared emergency shall be the difference between the value of the milk equivalent of such cream or plain condensed milk at the appropriate class (II-A or II-B) price in the 201–210 mile zone and at the Class II-E price in the 0–250 mile zone from Boston.

"(3) Payment for any milk or milk product pursuant to this paragraph shall be made only once and shall be made by the appropriate handler as set forth in the following provisions: (i) by the handler first receiving the milk or milk product at a pool plant outside the marketing area; (ii) by the handler operating the plant where the milk or milk product is first received in the marketing area if the milk or milk product is not received at a pool plant outside the marketing area; or (iii) by the handler operating the plant from which the milk or milk product was delivered to a purchaser in the marketing area if such milk or milk product is neither received at a pool plant outside the marketing area nor at a plant in the marketing area.

"(4) The amount due pursuant to this paragraph shall be entered on the handler's account as a debit immediately after the filing of the report pursuant to Sec. 927.6(a)."

This section with further amendments not here relevant is found at 7 C.F.R. § 927.9(h).

as defined in the Order after the 1945 amendments. Accordingly, the market administrator billed the plaintiff for the payments exacted under § 927.9(h). They were computed in the following manner: Before September 1, 1946, when a federal milk order for the Ohio area went into effect, the amount exacted in the case of cream was the difference between the Class II–A (New York cream) price and the Class IV–A (New York butter) price; in the case of condensed milk it was the difference between the Class II–B (New York condensed milk) price and the Class IV–A (New York butter) price.[5] No consideration was given to the price actually paid to the non-pool plant for the milk products. § 927.9(h) (2) (ii). After the Ohio milk order became effective, the amount required to be paid was any plus difference between the class prices for cream and condensed milk under that order and the respective class prices under the New York order. § 927.9(h) (2) (i). The total exactions required from the plaintiff were about $10,000. His brief describes them as "penalty" payments, as did the witnesses at the promulgation hearing and the hearing examiner in his recommendations. Carefully avoiding the word "penalty," the Secretary's brief describes them as "compensatory" payments, i. e. compensation for competition of non-pool milk with pool milk.

We think "penalty" is the more accurate description. In a very rough way they may tend to compensate New York producers for having lost a sale, because they are an addition to the producer settlement fund and are taken into account in computing the uniform price payable to producers. But they are likewise required even if the plaintiff's purchases from the Ohio plant were made at times when no milk was available in the New York market area for processing into cream or condensed milk. § 927.9(h) (1) makes such fact immaterial.

█ Turning to the statute: Section 8c(5), 7 U.S.C.A. § 608c(5), declares that a milk order shall contain one or more of the "terms and conditions" described therein, "and (except as provided in subsection (7)) no others". Under subsection (7) (D) additional provisions are permissible, if they are "Incidental to, and not inconsistent with, the terms and conditions specified in subsections (5), (6), and (7) and necessary to effectuate the other provisions of such order." The immediate object of the Act is to fix minimum prices for the sale of milk by producers to handlers.[6] The Act itself does not define "producers" but it is clear from the context that the term refers to dairy farmers who supply the milk which the handlers market. The relevant portions of section 8c(5) are printed in the margin.[7]

5. During the period August 1945 to March 1946 the respective assessments amounted to approximately $8.65 per 40 quart can of cream, and $.80 per 100 lbs. of milk in the case of condensed milk. Exhibit 71, 1946 Hearing.

6. See Stark v. Wickard, 321 U.S. 288, 291, 64 S.Ct. 559, 88 L.Ed. 733.

7. "(5) In the case of milk and its products, orders issued pursuant to this section shall contain one or more of the following terms and conditions, and (except as provided in subsection (7)) no others:

"(A) Classifying milk in accordance with the form in which or the purpose for which it is used, and fixing, or providing a method for fixing, minimum prices for each such use classification which all handlers shall pay, and the time when payments shall be made, for milk purchased from producers or associations of producers. Such prices shall be uniform as to all handlers, subject only to adjustments for (1) volume, market, and production differentials customarily applied by the handlers subject to such order, (2) the grade or quality of the milk purchased, and (3) the locations at which delivery of such milk, or any use classification thereof, is made to such handlers.

"(B) Providing:

"(i) for the payment to all producers and associations of producers delivering milk to the same handler of uniform prices for all milk delivered by them: Provided, That, except in the case of orders covering milk products only, such provision is approved or favored by at lease three-fourths of the producers who, during a representative period determined by the Secretary of Agriculture, have been engaged in the production for market of milk covered in such order or by producers who, during such representative period, have produced at least three-fourths of the volume of such milk produced for market during such period;

Paragraph (A) authorizes the classification of milk in accordance with the form or purpose of its use, and the fixing of minimum prices for each use classification. This is because the economic value of milk depends upon the use made of it. To avoid inequities among producers if the price each received depended upon the use each handler makes of his milk, paragraph (B) authorizes provision to be made for the payment to producers of uniform prices for the milk delivered, irrespective of the use to which the milk is put by the particular handler to whom it is delivered. Such uniform prices are subject, however, to specified "adjustments." To accomplish the purposes of paragraphs (A) and (B), paragraph (C) authorizes the Secretary of Agriculture to set up the necessary machinery.

■ We think that the payments required by section 927.9(h) of the Order are part of the "minimum price" as that term is used in section 8c(5) (A) of the Act. The price of non-pool cream or condensed milk to a New York handler is in reality composed of two elements: (1) the initial cost, i. e., the amount paid to the seller, and (2) the amount of the penalty required to be paid under the Order. Section 927.9 (h) (2) (ii) assumes that the initial cost of the non-pool cream and condensed milk will be the Class IV–A (butter) price under the New York order. If this assumption

were true, the minimum prices of pool and non-pool cream and condensed milk would be the same and would satisfy the requirement imposed by section 8c(5) (A) that "Such prices shall be uniform as to all handlers * * *" [8] However, there is no substantial evidence in the record of the promulgation hearings which would indicate that the initial cost of non-pool cream and condensed milk would be the New York Class IV–A price. In fact, the only evidence bearing directly on this question supports the conclusion that the initial cost would be more than the New York Class IV–A price. Therefore, the result of the exaction of a penalty computed on the basis of the New York Class IV–A price rather than the actual cost to the handler is a price discrimination between a handler who purchases non-pool milk products and one who purchases pool milk products, although each makes the same use of such products in the New York marketing area. This in our opinion is contrary to the requirement laid down in section 8c (5) (A) that the minimum prices for each use classification shall be uniform as to all handlers.

■ The same is true of section 927.9(h) (2) (i) of the Order. That section provides for a penalty payment to be computed as any plus amount obtained by subtracting the applicable Cleveland order price from the New York Class-in-which-used price. While the Cleveland class price

the approval required hereunder shall be separate and apart from any other approval or disapproval provided for by this section; or

"(ii) for the payment to all producers and associations of producers delivering milk to all handlers of uniform prices for all milk so delivered, irrespective of the uses made of such milk by the individual handler to whom it is delivered;

subject, in either case, only to adjustments for (a) volume, market, and production differentials customarily applied by the handlers subject to such order, (b) the grade or quality of the milk delivered, (c) the locations at which delivery of such milk is made, and (d) a further adjustment, equitably to apportion the total value of the milk purchased by any

handler, or by all handlers, among producers and associations of producers, on the basis of their marketings* of milk during a representative period of time.

"(C) In order to accomplish the purposes set forth in paragraphs (A) and (B) of this subsection (5), providing a method for making adjustments in payments, as among handlers (including producers who are also handlers), to the end that the total sums paid by each handler shall equal the value of the milk purchased by him at the prices fixed in accordance with paragraph (A) hereof."

8. This is so because the amount of the penalty when the milk is not subject to another order is the amount by which the Class II-A or Class II-B price exceeds the Class IV-A price.

* The word 'production' was deleted and the word 'marketings' was substituted by section 2(d) of the Agricultural Marketing Agreement Act of 1937.

is a fair indication of the price actually paid by a New York handler for non-pool Ohio milk products, in most cases it will not be the exact cost because that class price does not include the profit margin of the Ohio seller. It may be argued that a slight disparity in price would be justified on the ground that this method of computing the penalty is the only feasible scheme from the standpoint of administrative convenience. But in the absence of any showing of administrative necessity, we are constrained to hold that any discrimination in price is contrary to the requirement of uniformity.

■ Consequently, the challenged provisions of the order under which the penalty payments were exacted are inconsistent with the terms and conditions specified in section 8c(5) (A) and therefore cannot be justified under section 8c(7) (D). As Mr. Justice Clark remarked in construing subsection (7) (D) in Brannan v. Stark, 342 U.S. 451, 72 S.Ct. 433, 439: "Finally, the provisions cannot be incidental to the enumerated terms and conditions since they are inconsistent therewith." And because of such inconsistency the court found it unnecessary to determine whether the provisions there under attack were " 'necessary to effectuate the other provisions' of the Order". Although Brannan v. Stark is not a precise authority for the case at bar, we think it tends to support our decision.[9]

Since we rest decision on the ground that the provisions of section 927.9(h) of the order are inconsistent with the terms specified in paragraph (A) of section 8c(5), it is unnecessary to discuss other contentions of the parties.

The judgment is reversed and the cause remanded for further proceedings consistent with this opinion.

L. HAND, Circuit Judge (dissenting).

Already before the order here in suit was passed in 1945, handlers had paid a "uniform price" to producers for fluid milk delivered in a marketing area, that price being computed as it has been under the order in suit. This was by the following formula. Milk was divided by its "uses"— "fluid milk" was one "use" and there were many others, which can be lumped as "products." Each "use" was given a "classified price," and the handler became liable for the price of the "use" to which he put his fluid milk: his liability was therefore the product of the number of hundredweights he took, multiplied by the "classified prices" for the "uses" to which he put them. The amounts for which handlers so became liable were added together, and the total was divided by the number of hundredweights of "fluid milk" delivered by the producers. The quotient was the "uniform price," and was the price at which the "pool" settled with its producers. Since this price was inevitably somewhere between the highest and lowest of the "classification prices," it followed that the account of any particular handler would never — except theoretically — equal the amount due by him to the producers for the milk which he had taken. If he had turned the milk to lower priced "uses," his payment would not equal the amount owed by the "pool" to the producers for that milk; if he had turned his milk to higher priced "uses," his payment would be higher. Nevertheless, it is obvious that the excesses would always exactly cancel the deficiencies, and that there would be enough to pay producers the "uniform price."

In administration it turned out that this system resulted in shortages of supply in the drier seasons and in variations in the "uni-

9. The court said:

"The payments to cooperatives are inconsistent with § 8c(5) (A), which provides that all handlers shall pay uniform prices for each class of milk, subject to certain adjustments of no concern here. The discriminatory effect of the payments becomes the more evident when they are considered in context with the reduction in the uniform allowance to all handlers on the price of Class II milk. That reduction was simultaneous with the establishment of the system of payments to be made to cooperatives only and to be funded by deductions from prices paid all producers. The result would have been substantially similar if the allowance to proprietary handlers had been reduced while the allowance to cooperatives had been permitted to remain at its previous higher level. Such a lack of uniformity in prices paid by handlers would clearly have contravened § 8c(5)(A)."

form price" to producers; and these the Secretary sought to correct by the amendments of 1945. Until then there had been no condition upon any "plant's" becoming a "pool plant" except that the milk received by it must be properly certified hygienically by the local public authorities. One provision of the order here in suit required all "pool plants" between August and March to supply to their allocated "marketing areas" in the form of "fluid milk" 25 per cent of all milk received by them, and for the other four months, 10 per cent. In addition, the provisions of the order here in suit imposed upon handlers who procured milk or "products" from a "non-pool plant" the payments or penalties which the plaintiff has paid and seeks to recover in this action. These provisions were designed to protect the "uniform price" from the competition of "non-pool" handlers, and to induce plants to become "pool plants" subjecting themselves to the conditions just mentioned. This the Secretary attempted to do by financially handicapping handlers of "non-pool" milk; probably because the Act—§ 8c(5) (G)—forbade him to "prohibit" or "limit" the "marketing" of "products" in a "marketing area." These provisions required "non-pool" handlers to pay a differential, made up of the difference between a minuend and a subtrahend, determined as follows. The minuend was always the local "classification price" for the "use" to which the "non-pool" handler had turned the milk. The subtrahend differed according to whether or not the "product" had been made under the regulation of another "pool." Where it had not been, the subtrahend was the local "classification price" for butter fat; when it had been, it was the "classification price" fixed in that order for the "use" to which the milk had been turned.

What orders, short of prohibition or limitation, the Secretary might adopt to protect the new system of "pool plants" which he had set up, it was certainly for him to say within the limits of his statutory powers. One method might have been to restore to the producers in a "pool" what they had lost by the "non-pool" competition of each handler; but that was patently impossible to determine, and nobody suggests that it should have been attempted. Another method was to impose upon a "non-pool" handler the same cost that "pool" handlers must pay, thus eliminating any inducement to poach, so to say, upon the local "pool." The provisions in suit were promulgated to effect this purpose; and I shall assume that they can be defended only on that ground. However, like all rules made to carry out statutory powers, it was not necessary that in application they should go not a jot beyond the exact purposes for which they were intended. There is always a permissible latitude or overlap, which can be justified by the administrative difficulties which may arise in exactly limiting the scope of the measures taken to their need. The Secretary, if he was justified in supposing that the remedy which exactly matched the evil, would prove in execution more cumbersome, dilatory and obstructive than any prejudice which its application would impose upon a handler, was entitled to adopt it, although of course this exercise of his "discretion" is reviewable by us. His decision, and our review of it, do indeed involve a choice between conflicting interests, for which there are, and can be, no general rules. The standard applied is "arbitrary": i. e. personal; and its ambit is correspondingly narrow, and should be jealously scrutinized; nevertheless it is a delusion to suppose that such latitude is not inevitable in all administration, which without it would degenerate into an impenetrable jungle of verbiage. We ought, I submit, approach the determination of the differential with this in mind.

No one can object to the minuend: i. e. the local "classification price" for the "use" in question—for that is what the "pool" handler has to pay; the doubt arises as to the subtrahend: i. e. the proper credit for the amount which the "non-pool" handler has already paid. When there is a similar order in the "pool" where he has bought, it is fair to take the "classification price" in that "pool" for that "use." It is possible that on occasion he may have to pay more, but by hypothesis the price has been fixed as adequate in that market, and it is likely to be the current price. In any event I

cannot think that it will be argued the Secretary was not free in the interest of convenient administration to assume that outside "pool" handler has paid no more. However, only a small part of the recovery here at bar is for products sold after a "pool" had been installed in Ohio; and the subtrahend used to compute the differential during the earlier period presents greater difficulties. It must be owned that there is not the least reason to suppose that the price paid by a handler in an unregulated market will be the same as the "classified price" of butter fat in a local "pool"; and there must be substantial reasons for so fixing his subtrahend. I think that there were. The alternative—so far as I can see, the only one—was to conduct an inquiry as to what the handler had in fact paid for each purchase; and that was imperative, I submit, only in case its absence would deprive the putative handler of an interest plainly more weighty than the impediment which the inquiry would impose upon fixing the subtrahend to be used. In such an inquiry the Secretary would have to choose between accepting the evidence of the handler, to whom all the facts were accessible, and conducting an inquiry of his own which would on occasion be expensive and would always be dilatory. Against this was imposed the chance that a "non-pool" handler might be compelled to compete with the "pool" upon unequal terms: i. e. would not be allowed his full cost. I do not disguise the fact that that was a very real chance; I may even assume for argument that as to all "uses" except butter fat itself, it was an extreme probability. On the other hand, it seems to me that the "non-pool" handler's interest in an "unloaded" competition was not of enough importance —or at least that the Secretary might conclude that it was not—to require what would amount to a controversial inquiry as to each purchase in which the Secretary would be at great disadvantage. It was not as though the "non-pool" handler was deprived of his milk—by hypothesis he was free to sell it in the unregulated area where it was produced, or any other such area. All that the order denied him was the privilege of invading the "pool" upon equal terms with the "pool" handlers. I cannot

believe that that interest was so vital that to protect it the Secretary was compelled to clog the administration of the Act as the plaintiff insists that he was.

There remains the question whether the statute gave the Secretary adequate authority to promulgate the provisions in suit; and § 8c(5) (C) and § 8c(5) (B) did not do so. Laying aside § 8c(5) (C) as too indefinite, his authority must therefore be found in the parentheses at the outset of § 8c(5): ("except as provided in subsection (7) )." Nothing "provided" in that subsection is relevant except subdivision D, which allows the Secretary to insert in an order any specifications, "incidental to" and "necessary to effectuate the other provisions of such order." I shall not labor the argument that the provisions in suit were "incidental" to the order, and that their "necessity" was clearly for the Secretary to decide. I shall confine myself to whether they were "inconsistent with the terms and conditions specified in subsections (5), (6), and (7)." The only parts of these three subsections with which they can be thought to be "inconsistent" are § 8c(5) (A), § 8c(5) (B) and § 8c(5) (G). Section 8c(5) (A) authorizes the insertion in an order of "terms and conditions" fixing "minimum prices" that all handlers shall pay "for milk purchased from producers". The provisions in suit do not do that; they fix no prices "for milk purchased from producers" at all, if by "price" is meant the money that eventually goes to producers in payment for their milk. The differential exacted from a "non-pool" handler is not the "price" of anything; moreover—for whatever that may be worth—it is collected "to accomplish the purposes" of assuring "minimum prices" for milk delivered by producers, § 8c(5) (C). Section 8c(5) (B), unlike § 8c(5) (A), is not concerned with fixing prices that handlers shall pay for milk delivered to them; but with the payment to producers for the milk delivered by them; and § 8c(5) (B) (i) may be ignored, for it only demands uniformity of price for the milk delivered to "the same handler": Section 8c(5) (B) (ii) requires a single price to be paid to all producers for all milk delivered to handlers, "irrespec-

tive of the uses made of such milk by the individual handler to whom it is delivered": *i. e.* the producers shall be paid a "uniform price" for "fluid milk." The provisions in suit can indeed be deemed "inconsistent" with this, if one reads "all producers" to include "non-pool" producers, for the differential is not paid to the "non-pool" producers; and indeed, even if it were, it would not make the price paid to such a producer the same price as that paid to other producers. However, it is apparent that such producers were not intended, for if they were, "non-pool" producers whose milk came into competition with a "pool" would be automatically included in the "pool."

There remains only § 8c(5) (G), which forbids any order affecting "any marketing area" to "prohibit or in any manner limit, in the case of the products of milk, the marketing in that area of any milk or product thereof produced in any production area in the United States." This was introduced at the demand of cheese-makers, principally of Wisconsin, to prevent the exclusion of their cheese from any "marketing area"; it was not intended to touch the price of milk or "milk products." The provisions in suit do not in terms limit "the marketing" of any "products" in the area of a "pool," although no doubt they do lessen the inducement to such "marketing," which in turn would almost certainly result in marketing fewer of such "products" in that area. The plaintiff's argument therefore is, and indeed must be, that § 8c(5) (G) forbids any provision in an order, however necessary to protect a "pool," if in operation it will result in limiting the introduction of "products" into "the marketing area." I cannot believe that, when Congress decided to regulate the industry in order to assure a "uniform price" to producers, it meant by § 8c(5) (G) to forbid all protective measures, which should result in lessening the amount of "products" which without such measures would have entered the "marketing area" in question. It is not necessary in any such way to expand the literal meaning of the word, "limit," and its conjunction with the word,

"prohibit," strongly suggests that it was directed only against any express quantitative limit. Of course I agree that the Secretary might not put such a limit upon the amount of "products" that might come in from outside; but I do not believe that he might not economically handicap those who sought to bring them in, although, as was inevitable, such a handicap would diminish the amount which entered the "marketing area."

I can see so little basis for the assertion that the provisions in suit are unconstitutional that I shall not discuss it. The only possible doubt would be as to the plaintiff's condensed milk before the notice of hearing was amended, and as to that I am in accord with the "Judicial Officer" that it is a case of *de minimis*. I think that the order should be affirmed.