UNITED STATES of America,
Plaintiff,

v.

LEHIGH VALLEY COOPERATIVE
FARMERS and Suncrest Farms,
Inc., Defendants.

LEHIGH VALLEY COOPERATIVE
FARMERS, INC., Plaintiff,

v.

Ezra Taft BENSON, Secretary of Agriculture of the United States of America, Defendant.

SUNCREST FARMS, INC., Plaintiff,

v.

Ezra Taft BENSON, Secretary of Agriculture of the United States of America, Defendant.

Nos. 23268, 26048, 26109.

United States District Court
E. D. Pennsylvania.
April 25, 1960.

M. Durbin, U. S. Dept. of Agriculture, Washington, D. C., of counsel.

Willis F. Daniels, Daniels & Swope, Harrisburg, Pa., C. Weston Overholt, Jr., Philadelphia, Pa., for Lehigh Valley Cooperative Farmers, Inc., and Suncrest Farms, Inc.

Benjamin M. Quigg, Jr., Philadelphia, Pa., Anson W. H. Taylor, Jr., New York City, Richard Wiles, Syracuse, N. Y., William J. Moore, Frank B. Lent, New York City, and Morgan, Lewis & Bockius, Philadelphia, Pa., filed a brief for Dairymen's League Co-operative Association, Inc., Metropolitan Co-operative Milk Producers Bargaining Agency, Inc. and Mutual Federation of Independent Co-operatives, Inc., as amici curiae, in support of the government's cross-motions for summary judgment.

CLARY, District Judge.

This action arises under the Agriculture Adjustment Act of 1933, as amended by the Agricultural Marketing Agreement Act of 1937 (hereinafter referred to as the "Act"), 7 U.S.C.A. § 601 et seq. Section 608c(15) (B) of that Act authorizes a district court's review of the rulings of the judicial officer of the United States Department of Agriculture, who acts pursuant to authority delegated to him by the Secretary of Agriculture. The particular questions which Lehigh Valley Cooperative Farmers and Suncrest Farms, Inc.[1] raised in this review proceeding deal with one of the numerous amendments to Order No. 27 by the Secretary (7 C.F.R. § 927) which originally regulated the handling of milk in the metropolitan New York milk marketing area. The ruling under attack upheld the validity of one of these amendments to Order No. 27, which amendment extended the marketing area defined in that Order to all or part of thirteen counties in northern New Jersey, effective August 1, 1957. Both of the plaintiffs, who distribute milk in this

Walter E. Alessandroni and Richard Reifsnyder, Asst. U. S. Attys., Philadelphia, Pa., for the United States. John

---

[1]. Unless otherwise indicated the word "plaintiffs" will refer to the private parties and the word "defendant" will refer to the United States.

new area, strongly object to certain provisions in amended Order No. 27.

Prior to the present action and shortly after newly amended Order No. 27 became effective, the government brought suit in this Court under § 608a (6) of the Act to enforce, by injunctive order, the terms of the amended Order against the present plaintiffs. United States v. Lehigh Valley Cooperative Farmers, D.C.E.D.Pa.1957, 161 F.Supp. 885. On motion by the defendants in that action (the plaintiffs here), this Court ruled that although it was the intention of Congress that reports as well as payments to the Producer Settlement Fund called for by Order No. 27 should be made during *pendency* of administrative review before the Secretary of Agriculture, where irreparable harm could come to the defendants by ordering them to pay into this fund because payments might be made to participants in the fund "pool" who later leave the pool, the defendants would be ordered to make the required payments into the registry of the court pending the final outcome of review of amended Order No. 27 and would further be enjoined from violating the other requirements of Order No. 27. Now that the plaintiffs have unsuccessfully exhausted their administrative remedies, they ask this Court to review the action of the Secretary and rule that it is not in accordance with law. See 7 U.S.C.A. § 608c(15) (B).

The government's original enforcement action (under which the plaintiffs continue to pay monies due into this court) and the plaintiffs' suit for review of the administrative ruling have been consolidated in this action. Since there is no genuine dispute as to the material facts and purely legal questions appear to be raised by the pleadings, both parties have moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A. See Wawa Dairy Farms v. Wickard, 3 Cir., 1945, 149 F.2d 860.

Our ruling here will thus determine the proper disposition to be made of these funds being deposited in the registry of the court pursuant to our Order in United States v. Lehigh Valley Cooperative Farmers, supra, and will, of course, affect the future operation of amended Order No. 27 itself.

Also before the Court at this time is a motion by the government to modify our temporary injunction of October 4, 1957, in the case of United States v. Lehigh Valley Cooperative Farmers, supra. The government bases this motion upon a further amendment to Order No. 27, effective September 1, 1958, which it claims has changed the essential facts upon which the injunction rested. This further amendment gives to handlers in the position of the present plaintiffs a right to *elect* a nonpool plant status (which they were by necessity, under the facts which led this Court to grant the injunction) or face full regulation under Order No. 27. Since the economic burden of full regulation as a pool plant would be much worse than that of a partially regulated nonpool plant, the plaintiffs have naturally elected nonpool status.

The government argues that by *electing* as of September 1, 1958 to be a nonpool plant, the defendants in the enforcement proceeding are thereafter obliged to pay money due under amended Order No. 27 directly to the Producer Settlement Fund and not into the registry of this court. It points out that the new provisions of Order No. 27 have not been contested by the defendants as unlawful and that this Court must therefore order them to comply with it. On the other hand, plaintiffs argue that there has been no essential change in the situation which gave rise to the injunction and therefore the motion to modify it should be denied.

To properly understand the present controversy it is necessary to briefly describe the extremely complex operation of Federal milk control in general and the history and operation of Order No. 27 in particular. A full explanation of the problems involved in the regulation

of the milk industry will not be attempted.[2]

Milk is generally not sold by the farmer (referred to as "producer" in the milk industry) directly to the consumer. Rather there is an intermediate step in its distribution. From the farmer it goes to a dealer (referred to as a "handler" in the milk industry).[3] One handler will usually receive the raw milk from a number of producers. He in turn sells it in the form of fluid milk, cream or milk products. Since the return of profit on fluid milk is greater than on cream and the return on cream in turn greater than on milk products (such as butter, cheese, etc.), the producer whose handler sells a larger portion of his milk in fluid form could expect a greater price for his raw milk, while producers whose raw milk happens to be sold for nonfluid milk purposes could expect a correspondingly lower price for his milk. To avoid the danger to a stable market which is produced by this difference in the price of milk according to its particular utilization, the government has adopted as a basic scheme of regulation in most of its 115 marketing orders, a plan whereby each producer of milk is paid a uniform price for all of the raw milk which he delivers to his handler, *regardless of what particular use it is thereafter put to by his handler.*

Briefly this is accomplished as follows: The Market Administrator determines a "class price" which a handler must pay for each of the different uses he makes of the fluid milk (i. e., a class price for milk which he sells as fluid milk, a class price for milk which he sells as cream, and a class price for milk which he sells as a milk product.) He then computes the value of all of the milk used by a handler by multiplying the quantity of milk the handler uses for each class by the class price and totaling these sums. This amount is then divided by the total quantity of milk used by the handler to give him the *uniform unit price* to be paid each producer for the number of units of milk he produces.

Furthermore in a marketwide pool a *uniform unit price* is determined on a marketwide basis rather than on an individual handler basis. This is accomplished by totaling the marketwide use for each class, times the class price, divided by the total volume of milk used in the whole market. In such a market there is need for a *Producer Settlement Fund.* Thus a handler whose own total use value of milk for a set period is *greater* than his total payments at the uniform unit price (which is the case where a handler sells the greater part of his milk as fluid milk), must pay the difference into the *Producer Settlement Fund.* Each handler whose own total use value of milk is *less* than his total payments to producers at the uniform price (which would be the case where a handler sold the greater part of his milk as milk products) is entitled to withdraw the difference from the Producer Settlement Fund. Grant v. Benson, 1955, 97 U.S.App.D.C. 191, 229 F.2d 765, 767, certiorari denied 1956, 350 U.S. 1015, 76 S.Ct. 658, 100 L.Ed. 875. In this way the producers are compensated solely according to the amount of raw milk which they handle and not according to the particular use to which their milk may be put.

The plants at which the milk is received by these handlers who participate in the Producer Settlement Fund are called "pool plants". Prior to the August 1, 1957 amendment to Order No. 27, those handlers who sold less than one-half of their total milk sales in the Order

---

2. For the background and history of Order No. 27, see Nebbia v. People of State of New York, 1934, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940; United States v. Rock-Royal Co-op., 1939, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446. See also Brooks, The Pricing of Milk under Federal Marketing Orders, 26 Geo.Wash. L.Rev. 181 (1958).

3. In certain instances an individual farmer or a group of farmers may also act as "handler" for their own milk or for milk of others.

No. 27 area could not have their plants recognized as pool plants and were not fully regulated under Order No. 27. Both of the plaintiffs in this action make only a small per cent of their sales in the Order No. 27 area (Suncrest Farms approximately 5% and Lehigh Valley approximately 4%), the remainder being sold in Pennsylvania. Therefore, they were not fully regulated pool plants under Order No. 27.

Plaintiffs and other nonpool plants like them, which are not fully regulated by Order No. 27, posed a fundamental threat to the regulatory scheme above described. This threat is more than a simple competitive one between competing milk dealers. Rather it involves a danger accentuated by the government's uniform price-regulating program itself, which is imposed upon the regular suppliers to this area. Thus, if nonregulated milk handlers (such as plaintiffs) are allowed to sell their milk in fluid form in the regulated area, they theoretically displace an equal volume of fluid milk sales which would ordinarily be made by fully regulated members. This automatically decreases the uniform unit price paid to all regular Order No. 27 producers for raw milk in the market area, since fluid milk sales produce the highest unit return of all classes of sales. Therefore *all* of the pool producers who regularly supply the Order No. 27 area feel this loss. If such sales become substantial enough they could disrupt the basic plan of regulation. At any rate they admittedly have a harmful effect upon every fully regulated producer under Order No. 27. Moreover there is a constant temptation for those nonregulated handlers, whose primary supply areas lie outside of North Jersey and New York, to dump that raw milk which they can not sell as liquid milk in their own regular supply areas into the Order No. 27 area.

This problem of outside producers selling fluid milk in the Order No. 27 area results in great part from the nature of fluid milk itself and from the peculiar marketing problems involved in its distribution. Fluid milk cannot be stored for a long period of time. Moreover the production of fluid milk varies with the season; less milk being produced in the fall and winter than in the spring and summer. Yet the demand for fluid milk is fairly constant. Thus, if there is to be an adequate supply of fluid milk during less productive seasons there must necessarily be a surplus in the more productive seasons. The economic burden created by this surplus milk (including necessary reserves and seasonal surpluses) which must be turned into far less remunerative products, such as butter and cheese, might, if it fell onto the shoulders of a few dairymen, force them out of business. To avoid the dangerous effect which cutthroat competition during the overproductive season might have upon dairymen, and thereby insure the highly populated areas of metropolitan New York an adequate supply of fluid milk during all seasons, the Federal government promulgated Order No. 27 with its uniform market price scheme essentially designed to distribute this burden of necessary surplus among all of the regular suppliers in that market area. Although the regular suppliers of milk to the Order No. 27 area together can withstand the harmful effect of these sales of fluid milk by nonregulated handlers, the practice if not checked in some way could disrupt the orderly regulation of milk in the area in question. All of the parties seem to agree that these sales from outside handlers if unchecked pose a real problem to the effective operation of Order No. 27. The present dispute stems from the *method* used to avoid this problem.

To meet the problem the Secretary of Agriculture wrote into Order No. 27 a provision for *partial regulation* of those handlers who receive milk at nonpool plants and who traditionally distributed only a small part of their milk supply in the Order No. 27 area. Its purpose was presumably to discourage the dumping of fluid milk into the area (which we have pointed out results in lowering the uniform market price for all producers)

and also to distribute part of the surplus milk burden of this area onto those handlers who do not regularly supply it. Essentially this partial regulation required nonpool plant handlers to make a *compensatory payment* to the Producer Settlement Fund for all of the fluid milk they distribute in the Order No. 27 area. These payments help to increase the uniform unit price paid to the regulated suppliers of Order No. 27—and they in no way benefit the farmers who in fact supplied the milk to these nonregulated handlers. The payments are designed to offset the otherwise harmful effect created by such sales. The compensatory payment in the case of fluid milk sales is based on the difference between the Class I (fluid milk) class price and the Class III (milk products) class price of Order No. 27. For every unit of liquid milk sold by plaintiffs or other partially regulated handler, this difference must be paid into the fund. However, if Order No. 27 pool milk is in short supply as demonstrated by a stated formula, such charge is not made.[4]

There are three specific sections of Order No. 27 which the plaintiffs attack. First is Section 927.3 which extends the area covered by the former Order to include a number of counties in northern New Jersey. They base their attack on this section upon the alleged failure of the Secretary of Agriculture to give proper notice of the promulgation hearings at which evidence was presented in support of the amendment.

The remaining two sections which the plaintiffs attack are Sections 927.83 and 927.84 (hereinafter referred to as the compensatory payment provisions). These contain the compensatory payment provisions for which nonpool handlers such as the plaintiffs are liable. They base their attack on these sections upon substantive as well as procedural grounds. Thus they argue that these payments which must be made on all of their fluid sales in the Order No. 27 area (essentially based upon the difference between the Class I and Class III price of milk under Order No. 27): (1) are open to the same *notice* objections raised against Section 927.3; (2) are in direct conflict with Section 608c(5) (A) of the Agricultural Marketing Agreement Act, 7 U.S.C.A. § 601 et seq., which calls for *uniform* prices as to all handlers (subject only to certain adjustments admittedly not involved here); (3) are not supported by the evidence introduced at the promulgation hearings; and (4) are not authorized by any provision of the Act. The government denies each of these contentions.

### The Notice Problem

As already stated, the plaintiffs attack the amendment to Order No. 27 which effected the incorporation of part of northern New Jersey into its coverage. They argue that (1) there was a lack of due notice of the hearings leading up to the amendment in question; (2) there was improper use of the record of the various hearings by the Secretary; and (3) there were improper rulings and orders by the Secretary.[5] Upon close examination it becomes evident that all of these objections develop from the notice problem, and stand or fall with it. That problem stated simply is: Did the Secretary of Agriculture give the plaintiffs due notice of, and an opportunity for hearing upon the proposed change in Order No. 27?

4. The above is an extremely simplified description of the "exquisitely complicated" milk problem. Other provisions of Order No. 27 which may be important in understanding the contentions of the respective parties will be pointed out in the course of the opinion.

5. These rulings had to do with the plaintiffs' objection to the opening of the March 5, 1957 hearing (which objection rested upon the alleged lack of proper notice of that meeting) and with his request to recall for cross-examination certain witnesses who had testified at earlier hearings. See plaintiffs' brief, pages 61 and 62.

Such notice is required by § 608c (3) of the Act, 7 U.S.C.A.[6] Pursuant to this Section, the Secretary of Agriculture issued a Regulation, 7 C.F.R. § 900.4, which stated that the time for hearings shall not be less than fifteen days after the date of publication of notice in the Federal Register, except in case of *amendments* to existing orders, in which case three days notice would suffice. After reviewing the evidence presented on this point, we are completely satisfied that the plaintiffs were in fact given due notice of the hearings which led to the promulgation of the amendment to Order No. 27 and also had opportunity for a full hearing upon the amendment.

This very problem was recently before Judge Wortendyke of the United States District Court for the District of New Jersey in the case of Ideal Farms, Inc. and Franklin Lakes Dairy Products, Inc. v. Benson, D.C.D.N.J.1960, 181 F.Supp. 62, and we need add little to what was said there. Although the parties are different, so as to bar any government claim of res adjudicata or collateral estoppel, the notice problem in both of these cases is essentially the same. We are therefore persuaded by Judge Wortendyke's opinion.

As therein pointed out, the plaintiffs' notice argument in that case (as well as here) rests upon the fact that all of the notices by the Secretary *prior* to the notice of February 28, 1957, which said notices preceded 84 hearings at which over 12,000 pages of testimony were taken, stated that the hearings were for the purpose of establishing a *separate* milk order for northern New Jersey. The plaintiffs argue that such a notice was in effect no notice at all as far as any order *incorporating* the northern New Jersey area into Order No. 27 is concerned. We flatly reject this contention

as too narrow and unrealistic an interpretation of the notice requirement contained in the Act. Plaintiffs admit that such a separate order could quite conceivably have contained terms identical with those of Order No 27—and in fact a proposal for such a separate identical order was made.[7] Moreover numerous separate provisions identical with those contained in Order No. 27 were proposed and discussed at these meetings *which were attended by the plaintiffs*. Willis F. Daniels, Esquire, counsel for the plaintiffs in the present action, was of counsel for the plaintiffs in the New Jersey action also.

Moreover the February 28, 1957 notice clearly satisfied the requirements of both the Act and the Secretary's Regulation on this point and pursuant to this valid notice there followed hearings commencing on March 5, 1957 and lasting until March 29, 1957. These consisted of 18 full days of hearings, all of which were attended by the plaintiffs. They continued beyond the 15-day notice time which plaintiffs have argued was required. If in the course of some 102 days of hearings and 16,000 pages of testimony, the plaintiffs failed to submit any evidence which would dissuade the Secretary from adopting the amended Order now under attack—and nowhere in their brief or at oral argument did the plaintiffs attempt to set forth such evidence—we do not feel that such failure justifies this Court's striking down the Order. In short, after an examination of the whole record, we are convinced that plaintiffs' notice argument is a technical one only and that they have not suffered any real harm by virtue of the various notices in dispute, but were in fact fairly apprised of the type of milk order which would be promulgated and had an adequate opportunity to be heard upon the proposed

6. The Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq. contains *general* provisions calling for due notice to interested parties and an opportunity for a hearing upon any proposed order. Although the plaintiffs rely primarily upon the notice requirement of the Agricul-

tural Marketing Agreement Act and the Secretary's Regulation, the court's ruling answers any claim based upon the more fundamental requirements of the former Act.

7. See 21 F.R. 3544–3575.

amendment to Order No. 27. See Morgan v. United States, 1938, 304 U.S. 1, 58 S.Ct. 999, 82 L.Ed. 1129.

Plaintiffs' argument that there was improper use of the record stems from its contention that although the Secretary relied upon all of the hearings between June 18, 1956 and March 29, 1957, at best, only one of these hearings was preceded by proper notice to the plaintiffs. Therefore, they argue, the resulting amendment based upon these "improper" hearings must be struck down, even if the last hearings were held to have satisfied the notice requirement.

Again we must take issue with the plaintiffs. The Secretary will not be completely denied the benefit of this wealth of proposals and statistics amassed during the course of these hearings on the regulation of milk in northern New Jersey, simply because that regulation ultimately took the form of an amendment to the already existing Order No. 27, rather than as a totally separate order. As the government points out, the comprehensive or single order, although not directly in issue in the earlier hearings was at least a subsidiary issue.[8] All of the facts adduced were relevant to the issue of whether there should be any Federal regulation of northern New Jersey and what form those regulations should take. It is enough that the final series of hearings took up the question of the desirability of a single comprehensive order, and that throughout those 18 days of hearings, counsel for the plaintiffs actively participated and never requested a continuance to prepare evidence to meet the allegedly "new" issue of a single order. Upon a review of the whole record, we feel that the conclusion is inescapable that the plaintiffs have not been prejudiced by any alleged errors in notice or in the Secretary's use of the entire 108 days hearing record.

Are the Compensatory Payment Provisions of the Amended Order Inconsistent With § 608c(5) (A) of the Act?

Section 608c(5) reads:

"In the case of milk and its products, orders issued pursuant to this section shall contain one or more of the following terms and conditions, and (except as provided in subsection (7) of this section) no others:

"(A) Classifying milk in accordance with the form which or the purpose for which it is used, and fixing, or providing a method for fixing, minimum prices for each such use classification which all handlers shall pay, and the time when payments shall be made, for milk purchased from producers or associations of producers. Such prices shall be *uniform as to all handlers,* subject only to adjustments for (1) volume, market, and production differentials customarily applied by the handlers subject to such order, (2) the grade or quality of the milk purchased, and (3) the locations at which delivery of such milk, or any use classification thereof, is made to such handlers." (Emphasis supplied.)

The plaintiffs vigorously assert that compensatory payment provisions in the present Order (pursuant to which they continue to make payments into this Court under our October 4, 1957 injunction) are in direct conflict with the above provision and are therefore void. This contention rests upon the authority and reasoning of the 2nd Circuit Court of Appeals in Kass v. Brannan, 1952, 196 F.2d 791, certiorari denied 344 U.S. 891, 73 S.Ct. 210, 97 L.Ed. 689. If the compensatory payment provisions are found to be inconsistent with the Agriculture Marketing Agreement Act they of course must fail. Although the government and those parties who filed a brief amicus curiae make an attempt to distinguish this case, it is evident that their principal defense to this legal opinion is that it was erroneously decided and therefore

8. See for instance, p. 23 of the government's brief.

should be rejected by this Court. We have read the Kass case carefully and are convinced that the government has failed to distinguish it in principle from the present case.

The facts and holding of that case are briefly as follows: The plaintiff was a handler who distributed nonpool milk in the New York area and thus was not fully regulated under Order No. 27. He was however subject to partial regulation since his plant was licensed by the New York health authorities. He purchased cream and condensed milk from an Ohio nonpool plant and sold it in New York. He was billed by the Market Administrator for a compensatory payment under the former § 927.83, the amount being computed by essentially the same method employed in our own case, (i. e., the difference between the Class IIA (New York cream) price and the Class IVA (New York butter price).) He objected to these payments and after failing in administrative review was unsuccessful in his review action in the District Court under 7 U.S.C.A. § 608c(15) (B). On appeal, the Second Circuit reversed the District Court which had dismissed his complaint, and *held* that the compensatory payment provisions were inconsistent with § 608c(5) (A) of the Agricultural Marketing Agreement Act. They viewed the payment made under the compensatory provisions of the Order as a part of the "minimum price" as that term was used in § 608c(5) (A) and since this payment *plus* the actual cost to the plaintiff handler (i. e., the price which he paid to the Ohio concern) would result in a cost to him higher than the cost of like cream and condensed milk to pool-regulated handlers, they concluded that such a requirement established a minimum price which was not *uniform for all handlers* as required by § 608c(5) (A). Kass v. Brannan, supra, 196 F.2d at page 796.

If the Kass case is followed, we view it as inescapable that the compensatory payment provisions of amended Order No. 27 must be struck down as not in accordance with the Agricultural Marketing Agreement Act. We reach this conclusion after a close reading of the Kass opinion in conjunction with the facts of the case before us. The facts in these two cases are not identical and the government has carefully set out the several differences. Nevertheless we are convinced that these differences are not determinative. Although we might be tempted to grasp at them and perhaps even develop others in an effort to avoid the serious responsibility of striking down a Federal Regulation, any attempt to accept the Kass case as good law and at the same time sustain the compensatory payment provisions as they now appear in the present Order would, in our opinion, be illogical and inconsistent.[9]

Moreover we feel bound by the holding of the Second Circuit in the Kass case. Although we are not compelled to accept

9. The government makes much of the fact that plaintiff Lehigh Valley Cooperative Farmers, Inc., which has also been regulated under Federal Order No. 61 for Philadelphia since July 1, 1957 and is thereby charged compensatory payments pursuant to § 927.83(b) (1), rather than § 927.83(b) (2) which *regulates the* compensatory payments of plaintiff Suncrest Farms, Inc. Actually the amount of compensatory payments for each will be the same, since § 927.83(b) (1) specifically provides that payments under that section "shall be at the rates set forth in subparagraph (2) (i. e., Suncrest's rate) if the other Order permits * * * [certain deductions]". Order No. 61 does permit such deductions. Therefore Lehigh Valley must also pay the difference between the Class I and Class III Order No. 27 price into that Producer Settlement Fund. Although it is then required to pay only the Class III price to its producers under the terms of Order No. 61, the uncontroverted facts in this case are that it can not purchase raw milk from its producers at that low price and in fact is forced to pay more for it. Thus its *actual cost* plus the compensatory payment is substantially higher than the cost to fully regulated Order No. 27 handlers. This runs afoul of the Kass holding. For this reason we have not distinguished between the plaintiffs throughout our opinion. If Kass is followed, both plans seem equally objectionable.

that Court's decision under the concept of *stare decisis* as it applies to Federal Courts and although we might have reached a contrary result if initially called upon to interpret § 608c(5), we do not feel justified in now rejecting the interpretation there placed upon § 608c (5) (A) and upon the earlier version of Order No. 27. That Court's opinion is always entitled to great weight. The government was unsuccessful in its effort to have the Supreme Court review it. Instead it chose to delete that form of compensatory payment provision from the Order. With the mere passage of time and by reinstating "compensatory payments" they now ask this Court to sustain it. When we further take into consideration the fact that the Second Circuit has had frequent occasion to deal with the Agricultural Marketing Agreement Act and with Order No. 27,[10] and the Circuit's jurisdictional boundaries encompass metropolitan New York (the area which Order No. 27 was originally designed to regulate), we do not feel justified in rejecting that opinion.

The government cannot argue (nor has it attempted to argue) that the total cost to the plaintiffs of the liquid milk which they sell in northern New Jersey is equal to the cost to its competitors. There is uncontroverted evidence to prove that the cost of raw milk to the plaintiffs is substantially higher than the Order No. 27 uniform Class III price classification, so that the *total* cost to the plaintiff handlers (when we include the compensatory payment based upon the difference between the uniform Class I and Class III price) will be in excess of the cost to fully regulated pool plant handlers. This is exactly what Judge Swan said § 608c(5) (A) of the Agricultural Mar-

keting Agreement Act prohibited. Kass v. Brannan, supra.

### Are the Compensatory Payment Provisions of Order No. 27 Supported by the Record?

The plaintiffs also argue that the compensatory payment provisions should be struck down for the further reason that they are unsupported by the evidence in the record. In the event that our ruling based upon the Kass case is reversed, and it is likely to be subjected to appellate review, this argument would return to us for decision—with the facts exactly as they appear now. We therefore feel it proper at this time to pass upon this contention.

The allegation that an administrative order of the Secretary is not supported in the record of the hearings leading up to its enactment, would present a tremendous problem for the Court in this type case *if* we were required to read the whole record consisting of some 16,000 pages of testimony along with numerous complicated exhibits—and then weigh the propriety of that order in the light of all of that evidence. Neither our time nor our talents in this very complicated area of Federal regulation would permit the accomplishment of such an undertaking. The Court views its task as a much narrower one. Upon review of this issue, all that the Court need find is sufficient evidence in the record to support the Secretary's order.[11] Once this is done, the Court need go no further.

From a reading of those portions of the administrative record which the government has annexed to its brief as supporting the amendment under attack, the Court is convinced that there is sufficient evidence to support a finding of need for

10. General Ice Cream Corp. v. Benson, 2 Cir., 1954, 217 F.2d 646; Crowley's Milk Co. v. Brannan, 2 Cir., 1952, 198 F.2d 861; New York State Guernsey Breeders' Co-op., Inc. v. Wickard, 2 Cir., 1944, 141 F.2d 805, 153 A.L.R. 1165; Queensboro Farms Products v. Wickard, 2 Cir., 1943, 137 F.2d 969; etc.

11. Wawa Dairy Farms v. Wickard, 3 Cir., 1945, 149 F.2d 860; New York State Guernsey Breeders' Co-op., Inc. v. Wickard, 2 Cir., 1944, 141 F.2d 805, 153 A.L.R. 1165.

some form of Federal regulation of the sale of milk and its products by nonregulated handlers in the Order No. 27 area.[12] The form of regulation chosen by the Secretary (i. e., so-called compensatory payments to the Producer Settlement Fund) was otherwise calculated to correct this problem and would likely produce the desired result if it did not run afoul of § 608c(5) (A) of the Agricultural Marketing Agreement Act. Therefore, were we to be found in error in our holding that the law as expressed in the Kass opinion requires us to strike down the present compensatory payment provisions of Order No. 27, we believe those provisions should otherwise stand as supported by the record.

### Are the Compensatory Payment Provisions of Order No. 27 Authorized by the Agricultural Marketing Agreement Act?

■ Like the problem of whether there is support in the record for the adoption of the compensatory payment provisions of Order No. 27, we feel it proper to pass upon the question of whether the Act authorizes such provisions at this time, even though we might avoid doing so in light of our holding that those provisions are otherwise invalid.

If such compensatory payment provisions are authorized by the Act, we think their authorization must be found in § 608c(7) (D). That section authorizes the Secretary to include as terms in a milk order, those "incidental to, and not inconsistent with, the terms and conditions specified in subsections (5)–(7) of this section and necessary to effectuate the other provisions of such order." The plaintiffs, as already pointed out, take the position that since compensatory payments are in fact inconsistent with § 608c(5) (A) of the Act, they are not authorized by § 608c(7) (D). With this

we agree. Kass v. Brannan, supra. However, should we be wrong in this conclusion, the question would remain [196 F.2d 795]: Are such provisions "incidental to * * * and necessary to effectuate the other provisions of such order"? We think they would be.[13]

Whether provisions are "incidental and necessary" to effectuate an order of the Secretary as those terms are used in § 608c(7) (D) will depend upon the particular order in which they appear. From an examination of Order No. 27 *without* the compensatory payment provisions in dispute, and keeping in mind the milk supply problem of the area involved, we believe that the compensatory payment provisions are calculated to carry into effect the powers granted to the Secretary by the Act, as those powers are exercised in the remaining sections of Order No. 27. This is enough to bring them within the terms of § 608c(7) (D). Brannan v. Stark, 1952, 342 U.S. 451, 72 S.Ct. 433, 96 L.Ed. 497.

By a plan of full regulation of those who regularly supply the Order No. 27 area, based upon a marketwide pool, the Secretary has distributed the burden of surplus milk and its resulting decreased return in the form of milk products, upon *all* of the fully regulated handlers and their suppliers. So long as there is a reasonably high percentage of fluid milk sales and a corresponding reasonably low percentage of nonfluid sales (whatever those relative proportions might be for a healthy market) the return to the farmers will be adequate. Sales of fluid milk in the area by nonregulated handlers pose a fundamental threat to this adequate amount of return. If unchecked, they could seriously disrupt the whole regulatory plan. The compensatory payment provisions (which provisions appear in varying form in almost all of the government's milk regulating orders) are calculated to check or greatly minimize this threat. Thus they are calculated to

---

12. See government's brief pp. 36–47.

13. The majority in the Kass case expressly reserved this question (196 F.2d at page 797), and Judge Learned Hand, dissenting in that case, also failed to pass upon it (at page 799).

carry into effect Order No. 27 and are authorized by the Act as "incidental" and "necessary" to carry out its terms, § 608c(7) (D).

Does the September 1, 1958 Amendment to Order No. 27 Require Modification of this Court's Injunction?

Subsequent to our injunctive order in the case of United States v. Lehigh Valley Cooperative Farmers, D.C.E. D.Pa.1957, 161 F.Supp. 885, the Secretary saw fit to further amend Order No. 27 so as to make handlers, such as plaintiffs, who sold milk in the Order No. 27 area fully regulated handlers unless they *elected* to be nonfully regulated handlers subject to the compensatory payment provisions of the Order (i. e., it forced the plaintiffs to "elect" that status which they had theretofore held automatically). Since the economic burden of full regulation would be even greater than is incurred under the compensatory payment provisions of the Order, the plaintiffs have of course made this "election". The government now takes the position that by making this "election", and failing to contest the legality of this amendment before the Secretary of Agriculture, the plaintiffs are precluded from raising any objection here to payments due after this "election", (i. e., after September 1, 1958).[14]

We must presume that this amendment to Order No. 27 was enacted by the Secretary to meet a real need in the milk industry and not to circumvent our injunction in the Lehigh Valley Cooperative Farmers case. To view it as otherwise would be to impute to an administrative department interference with the orderly administration of justice by action which would infringe upon the integrity of our judicial process. Nevertheless in view of our holding that the compensatory payment provisions are invalid, we do not feel that this amendment

calls for modification of our original injunction. Thus, if the compensatory payment provisions are struck down, no money should be paid the Market Administrator under those provisions. This is true regardless of whether plaintiffs were nonpool plants by *choice* or by *necessity*, unless we were to hold that by striking down the compensatory payment provisions, the Court automatically forced the plaintiffs into a fully regulated status under the terms of the September 1, 1958 amendment to Order No. 27. We flatly reject this conclusion. It may be that the Secretary could enforce full regulation upon handlers such as the plaintiffs by an appropriate order. See Titusville Dairy Products Co. v. Brannan, 3 Cir., 1949, 176 F.2d 332, certiorari denied 338 U.S. 905, 70 S.Ct. 307, 94 L. Ed. 557. We do not feel that by promulgating the September 1, 1958 amendment granting handlers an "election" between full and partial regulation, he intended to do so.

In short, if our present Order declaring the compensatory payment provisions of Order No. 27 unlawful is upheld, we think that by necessity the September 1, 1958 amendment must also fail. This conclusion does no violence to that line of cases which stand for the proposition that a district court can only review those matters which have *first* been presented to the Secretary of Agriculture, § 608c(15) (A), 7 U.S.C.A. Rather it is based upon the fundamental proposition that where one provision of an Act is critically dependent upon another provision of that same Act, and the latter provision is struck down, the former falls by necessity.

Conversely if the compensatory payment provisions of Order No. 27 are, upon review, found to be in conformity with the *Agricultural Marketing Agreement Act* and therefore lawful, the plain-

---

14. Although the government made this argument in its brief, there is real doubt as to whether it in fact contends that Lehigh Valley should be required to make

payments under the later amended order, directly to the Market Administrator. See the remarks by government counsel at pages 4 to 7 of the transcript.

tiffs will owe the Market Administrator for the whole period from the time that Order No. 27 was amended to include northern New Jersey to the present. To force plaintiffs to make payments directly to the Market Administrator after September 1, 1958, pending such final review, would be to defeat the very purpose of our original injunction.

■ At this point we might add a word concerning the government's argument based upon the case of Titusville Dairy Products Co. v. Brannan, supra. It advanced the argument throughout its brief in support of the motion for summary judgment, and most astutely in its brief in support of the motion to modify our injunction. The argument took this form: The Secretary undoubtedly has the power to *fully regulate* handlers such as the plaintiffs. Titusville Dairy Products Co. v. Brannan, supra. But partial regulation under the present compensatory payment provision is economically less onerous regulation than full regulation. Therefore, the Secretary undoubtedly has the power to partially regulate handlers such as the plaintiffs under the present compensatory payment provisions. Accepting both premises as true for argument sake, the conclusion does not follow. Any form of regulation, no matter how slight its economic burden, *must conform to the Act of Congress by virtue of which that regulation* purports to be promulgated. The present scheme of partial regulation does not. Kass v. Brannan, supra. Therefore it must fail.

For many years prior to the promulgation of amended Order No. 27, which incorporated northern New Jersey into its coverage, each of the plaintiffs here had regularly established retail milk routes in and around Phillipsburg, New Jersey, which city is located immediately adjacent to that part of Pennsylvania in which the plaintiffs' distributor plants are located. The economic effect of the amended Order was that plaintiffs were required by the terms of the Order to make payments to the Producer Settle-

ment Fund for every quart of fluid milk which they thereafter sold in northern New Jersey. Under no circumstances could they participate in any return from the Producer Settlement Fund into which they were required to pay. However, this fact standing alone would not preclude the Secretary, viewing the situation areawise, in including Phillipsburg, New Jersey, in the area set aside for the operation of amended Order No. 27. Nevertheless, in the light of the Kass v. Brannan decision, supra, the Order as promulgated did not comply with Section 608c(5) (A) of the Agricultural Marketing Agreement Act, 7 U.S.C.A., in that the prices were not uniform as to *all* handlers and in particular as to these two plaintiff handlers. Therefore, that part of the Order requiring compensatory payments to the Producer Settlement Fund by them must be stricken down.

Counsel for plaintiffs in Civil Actions No. 26048 and No. 26109 will submit, within twenty (20) days hereof, a proposed form of Decree consistent with the foregoing opinion.