**LAWSON MILK COMPANY, a corporation, Plaintiff,**

v.

**Ezra Taft BENSON, Secretary of Agriculture, Defendant.**

Civ. A. No. 34708.

United States District Court
N. D. Ohio, E. D.

Aug. 18, 1960.

67

H. Keith Eisaman, Landon G. Dowdey, Washington, D. C. (W. O. Handy, Cleveland, Ohio, of counsel), for plaintiff.

Julius C. Krause, Office of the General Counsel, U. S. Dept. of Agriculture, Washington, D. C. (Russell E. Ake, U. S. Dist. Atty., and William J. O'Neill, Asst. U. S. Dist. Atty., Cleveland, Ohio, of counsel), for defendant.

Glen W. Wagner, Port Clinton, Ohio (Thomas J. Quigley, Squires, Sanders & Dempsey, Cleveland, Ohio, of counsel), amicus curiae.

McNAMEE, Chief Judge.

The plaintiff, the Lawson Milk Company, is a corporation with its principal place of business in Cuyahoga Falls, Summit County, Ohio, within this district. Plaintiff brings this action pursuant to Section 8c(15) (B) of the Agricultural Marketing Agreement Act of 1937, 7 U.S.C.A. § 608c(15) (A), and Amendments, (hereinafter the Act), to review a ruling of the Judicial Officer of the United States Department of Agriculture dismissing on the merits a petition filed by plaintiff under Section 8c(15) (A) of the Act. In the proceeding before the Judicial Officer plaintiff

sought a refund of $92,405.62, representing payments made by it, allegedly under protest, to the Producers Settlement Fund, covering the period of December 1, 1947 through May 1952. These payments were exacted under Section 975.-72A of Order No. 75, which regulates the handling of milk in Cleveland, Cuyahoga County, Ohio and adjacent communities. Both parties have filed motions for summary judgment.

■ The jurisdiction of this Court is limited to a determination whether the decision of the Judicial Officer, adopted by the Secretary, is in accordance with law. Thus, only questions of law are presented in this review.

■ Plaintiff's plant in Cuyahoga Falls, Ohio is located about 31 miles from the center of Cleveland, Ohio. Prior to December 1, 1947 all of plaintiff's milk was distributed outside the Cleveland Marketing Area, most of it being distributed in Summit County, Ohio. In December 1947 plaintiff established a retail outlet in Bedford, Ohio, which is within the Cleveland market. During the period in question, plaintiff's sales of milk in the Cleveland market represented less than 10% of its total sales. After May 1952 plaintiff's sales in the Cleveland market exceeded 10% of its total sales and, pursuant to the terms of Order No. 75, plaintiff became a fully regulated handler. The primary object of Order 75, like that of similar orders in effect throughout various sections of the country, is to provide a stable market for milk and to secure to the producers, i. e.—dairy farmers, an adequate price for their milk. The farmers do not sell milk direct to the consumers but deliver it to various bottling plants known as handlers. The economic value of milk is determined by its use. A handler usually receives raw milk from a number of producers. He may sell it either as fluid milk, as cream, or as milk products such as butter and cheese. A handler realizes his greatest profit on the sale of fluid milk, a lesser profit on the sale of cream and a still lesser profit on the sale of milk products. Producers

therefore expect a higher price from handlers for raw milk sold by the latter as fluid milk and correspondingly lower prices for milk utilized in the production and sale of cream or milk products. The pricing of milk strictly in accordance with its utilization presents many difficulties and is conducive to an unstable market. To avoid these undesirable consequences the Government has adopted a scheme of regulation under which each producer is paid a uniform minimum price for all raw milk delivered to a handler irrespective of the use to which it is put. The plan thus devised operates fairly to place the greater burden of the uniform blend price upon those handlers who sell the greater part of their milk as fluid milk. This is accomplished in the following manner: the Market Administrator determines a class price which pool handlers must pay for Class I milk used as fluid milk, a class price for Class II milk sold as cream and a class price for Class III milk sold as milk products. He ascertains the market-wide use for each class, multiplies the results by the class prices and then divides the resultant sum of all class prices by the volume of milk used in the whole market. By this method a uniform or blend price for all raw milk is determined. A similar formula is applied to determine the use value of milk sold by individual handlers. Where the greater part of a handler's sales for a specified period is fluid milk, his total use value will be greater than the uniform price paid to his producers. Such a handler must pay the difference into the Producers Settlement Fund. A handler who sells the greater part of his milk as milk products will have a use value less than the uniform blend price and is entitled to withdraw the difference from the Producers Settlement Fund. By this method producers receive a uniform price commensurate with the weighted average use value of milk sold in the regulated market, and through the operation of the Producers Settlement Fund in the manner above described the cost of milk to handlers is

equalized. The plan also provides for payments by handlers of administrative assessments.

The foregoing is an altogether inadequate outline of the complicated scheme of regulation but will serve to indicate the essential elements of the plan. For a more comprehensive and detailed description of similar plans see: United States v. Rock Royal Co-operative Inc. et al., 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446; Grant v. Benson, 97 U.S.App.D.C. 191, 229 F.2d 765, 767, certiorari denied 350 U.S. 1015, 76 S.Ct. 658, 100 L.Ed. 875; United States v. Lehigh Valley Co-operative Farmers, D.C., 183 F.Supp. 80.

The handlers above referred to are pool handlers who regularly distribute more than 10% of· their milk supply to consumers in the Cleveland marketing area. Producers are dairy farmers whose milk is delivered directly from their farms to pool handlers. Pool handlers and producers are subject to full regulation under the terms of Order No. 75. During the period of December 1947 through May 1952 plaintiff, as a non-pool handler, distributed less than 10% of its fluid milk supply in the Cleveland marketing area and purchased its milk from farmers who were not producers, as that term is defined in Order No. 75. Section 975.-72(a) of Order No. 75 provided that non-pool handlers distributing less than 10% of their fluid milk supply in the Cleveland marketing area were required to pay to the Producers Settlement Fund an amount equal to the difference between the Class I price (fluid milk) and the Class III price (manufacturing) on all milk sold as fluid milk in such area. At the outset plaintiff refused to make the specified payments and the Secretary instituted an action in this Court to enforce the terms of Section 975.72(a). Early in 1949 plaintiff agreed to make all accumulated and future payments, and the action was dismissed. Thereafter, in June 1952 plaintiff became a fully regulated handler. A year later, in June 1953, plaintiff filed its petition under 608c(15) (A) of the Act to recover the payments made by it during the period of December 1947 through May 1952. In April 1958 the Judicial Officer of the Department of Agriculture dismissed the petition on the merits. In July of 1958 the Judicial Officer denied plaintiff's motion for re-consideration.

In the hearing before the Judicial Officer there was evidence tending to show that during the period in question the average price paid by plaintiff to its farmers for milk was in excess of the uniform minimum blend price and the uniform Class I price paid to producers under the Cleveland Order. Plaintiff submitted proposed findings of fact to the Judicial Officer which incorporated the. foregoing in detail. In addition plaintiff submitted, inter alia, a further proposed finding showing the average amount per hundred weight of milk paid by plaintiff as compensatory payments under Section 975.72(a). The Judicial Officer refused to make such findings presumably because in his opinion they were immaterial. Additional facts essential to an understanding of the decision reached herein will be stated in the discussion of the issues.

Plaintiff attacks the validity of Section 975.72(a) primarily on the ground that it is contrary to the law as announced in Kass v. Brannan, 2 Cir., 196 F.2d 791, 796. Plaintiff also relies upon Lehigh Valley Co-operative Farmers, Inc. et al. v. Benson, D.C., 183 F.Supp. 80, 89, which was decided on the authority of Kass. Plaintiff contends further that there is no substantial evidence in the record supporting the rate of payments exacted under Section 975.72(a) of the Order. The Secretary asserts that the ruling and Order of the Judicial Officer upholding the validity of Section 975.72 (a) are in accordance with law and advances many other grounds in support of his decision including the contentions that—Kass v. Brannan is not controlling; the evidence in the promulgation hearing record amply supports Section 975.72(a); plaintiff is estopped to claim the refund it seeks; and that Order No. 75 provides a cut-off date as to refund payments. By far, the most important

issue is whether Kass v. Brannan is controlling here. Kass was a handler as defined by the New York Marketing Order No. 27. He purchased cream and condensed milk from a handler in Orville, Ohio. Pursuant to Section 927.9(h) of Order 27 the Market Administrator exacted payments from Kass in the case of cream in an amount representing the difference between Class II–A (New York cream) price and Class IV–A (New York butter) price; in the case of condensed milk, the exacted payments represented the difference between Class II–B (New York condensed milk) price and Class IV–A. No consideration was given to the price Kass paid to the Ohio non-pool plant. Kass sought administrative relief by way of a refund of the payments. He was denied relief by the Judicial Officer of the Department of Agriculture whose decision was affirmed on review by the District Court. The Second Circuit Court of Appeals, however, with Judge Learned Hand dissenting, reversed. The Appellate Court held that the exacted payments were part of the minimum price as that term is used in Section 8c(5) (A) of the Act; that the price of non-pool cream or condensed milk to a New York handler was (1) the amount paid to the seller; (2) the "amount of the penalty required to be paid under the Order." The Court then added:

"Section 927.9(h) (2) (ii) assumes that the initial cost of the non-pool cream and condensed milk will be the Class IV–A (butter) price under the New York order. If

this assumption were true, the minimum prices of pool and non-pool cream and condensed milk would be the same and would satisfy the requirement imposed by section 8c(5) (a) that 'Such prices shall be uniform as to all handlers * * *.' "

The Court found that the initial cost of the milk products was more than the New York Class IV–A price and that the exaction of an additional payment computed on the Class IV price rather than on the actual cost to the handler was—

"* * * a price discrimination between a handler who purchases non-pool milk products and one who purchases pool milk products, although each makes the same use of such products in the New York marketing area. This in our opinion is contrary to the requirement laid down in section 8c(5) (A) that the minimum prices for each use classification shall be uniform as to all handlers."

It is in no spirit of disrespect to the Second Circuit Court of Appeals that I profess my inability to accept the conclusion of that Court that the contested provisions of Order No. 27 are inconsistent with Section 608c(5) (A) of the Act. That section of the Act is quoted in full in the margin,* and in pertinent part reads:

"(A) Classifying milk in accordance with the form in which or the purpose for which it is used, and fixing, or providing a method for fixing, minimum prices for each such

---

\* "Marginal Note.

"§ 8c. *Orders regulating handling of commodity.* * * *

"(5) *Milk and its products; terms and conditions of orders.*

"In the case of milk and its products, orders issued pursuant to this section shall contain one or more of the following terms and conditions, and (except as provided in subsection (7) of this section) no others:

"(A) Classifying milk in accordance with the form in which or the purpose for which it is used, and fixing, or providing a method for fixing, minimum

prices for each such use classification which all handlers shall pay, and the time when payments shall be made, for milk purchased from producers or associations of producers. Such prices shall be uniform as to all handlers, subject only to adjustments for (1) volume, market, and production differentials customarily applied by the handlers subject to such order, (2) the grade or quality of the milk purchased, and (3) the locations at which delivery of such milk, or any use classification thereof, is made to such handlers."

use classification which all handlers shall pay, and the time when payments shall be made, for milk purchased from producers or associations of producers. Such prices shall be uniform as to all handlers, * * *."

Section 8c(5) (A) makes no reference to the fixing of minimum prices which handlers shall pay to handlers. In clear and unambiguous language the uniformity of minimum class prices required by Section 8c(5) (A) applies to the prices all handlers are required to pay for milk purchased from producers. The payments exacted from Kass were authorized by Section 927.9(h) of Order No. 27, which is entitled "Payments for Milk or Milk Products Other Than Producers' Sources." The pertinent provisions of section 8c(5) (A) of the Act authorize minimum class prices for milk received from producers. The contested provisions of the Order deal with the different subject matter of payments for milk and milk products received from others than producers. Moreover, Section 927.9(h) of Order No. 27 fixes no minimum prices. As Judge Learned Hand said in his dissent:

"Section 8c(5) (A) authorizes the insertion in an order of 'terms and conditions' fixing 'minimum prices' that all handlers shall pay 'for milk purchased from producers.' The provisions in suit do not do that; they fix no prices 'for milk purchased from producers' at all, if by 'price' is meant the money that eventually goes to producers in payment for their milk. The differential exacted from a 'non-pool' handler is not the 'price' of anything; moreover—for whatever that may be worth—it is collected 'to accomplish the purposes' of assuring 'minimum prices' for milk delivered by producers, § 8c(5) (C)." 196 F.2d at page 799.

It seems apparent, therefore, that Section 927.9(h) of the New York Order is not inconsistent with section 8c (5) (A) of the Act. Furthermore, the decision in Kass is premised on the assumption that it is the purpose of 8c (5) (A) to secure equality of costs between pool and non-pool handlers on milk or milk products distributed in a regulated marketing area. However, as I read that section, its purpose is to secure equality of costs among regulated handlers on milk purchased from producers. Even though the Kass decision be considered as sound, it is not controlling here. That case is readily distinguishable from the case under review on its facts, in the nature of the problem presented and in many other respects. United States v. Lehigh Valley Cooperative Farmers, supra, is more closely analogous. In that case the plaintiffs were distributors of milk in northern New Jersey and by virtue of amendments to Order No. 27 were brought within the extended New York marketing area. Only a small percentage of plaintiffs' sales were made in the Order 27 area, the remainder being made in Pennsylvania. Under an amendment to Order 27, plaintiffs were subject to partial regulation. Such regulation required non-pool handlers, including plaintiffs, to make compensatory payments to the Producers Settlement Fund for all fluid milk distributed in the Order 27 area. These payments were computed on the basis of the difference between the Class I (fluid milk) price and the Class III (milk products) price of Order 27. An exception was made in those cases where pool milk in the area was in short supply. Upon the authority of Kass v. Brannan, District Judge Clary held the compensatory payments unlawful. He found that the cost of fluid milk distributed by plaintiffs in the Order 27 area was in excess of the cost to fully regulated handlers and observed—"This is exactly what Judge Swan said § 608c (5) (A) of the Agricultural Marketing Agreement Act prohibited. Kass v. Brannan, supra."

In his opinion Judge Clary said:

"Moreover we feel bound by the holding of the Second Circuit in the Kass case. Although we are not compelled to accept that Court's de-

cision under the concept of stare decisis as it applies to Federal Courts and although we might have reached a contrary result if initially called upon to interpret § 608c(5), we do not feel justified in now rejecting the interpretation there placed upon § 608c(5) (A) and upon the earlier version of Order No. 27. That Court's opinion is always entitled to great weight."

■ It is apparent from the above quoted language and other statements in his opinion that Judge Clary considered that in determining the validity of the challenged compensatory payments of Order 27 he was bound to follow the Second Circuit's decision in Kass, which had struck down an earlier and somewhat similar provision for compensatory payments in the same Order. Judge Clary realized that upon appeal, the Third Circuit Court of Appeals might refuse to follow Kass, and that in such event the case would be remanded to the District Court for determination of the following questions: (1) Are the compensatory payments supported by the record? (2) Are such payments authorized by the Act? To obviate the necessity of a remand in the event of a reversal, Judge Clary passed upon both questions. He held (1) that the compensatory payments were supported by the record; (2) that such payments were authorized under subdivision (7) (D) of the Act as being incidental and necessary to effectuate the other provisions of the Order, thereby indicating that if not bound by Kass v. Brannan he would have upheld the contested provisions of Order No. 27 as being in accordance with law. The factors that Judge Clary prudently and properly considered are not present here. This Court is not bound to follow Kass v. Brannan, and for the reasons indicated above and hereinafter to be stated, Kass cannot be regarded as a binding precedential authority.

## Were the Terms of Section 975.72(a) of Order 75 Authorized by the Agricultural Marketing Agreement Act?

Such authorization must be found in Section 608c(7) (D), which reads:

"(7) *Terms common to all orders*

"* * * orders shall contain one or more of the following terms and conditions:

* * * * * *

"(D) Incidental to, and not inconsistent with, the terms and conditions specified in subsections (5)–(7) of this section and necessary to effectuate the other provisions of such order."

■ At the promulgation hearing, it was disclosed that at the fringe of the Cleveland marketing area and at other nearby points there were a number of non-pool handlers who regularly distributed milk outside the area. Located within the Cleveland area also were non-pool handlers whose regular deliveries of milk were made outside the area. It was reasonably anticipated that from time to time some of these non-pool handlers would sell and distribute their surplus milk in the Cleveland area at its highest value as fluid milk. Fluid milk sold in the regulated area by non-pool handlers displaces fluid milk sales that otherwise would have been made by pool handlers, causing the latter to use more of their milk for manufacturing purposes (Class III), thus reducing the uniform blend price to the producers. The prospect of such results constituted a real threat to the integrity of the basic regulatory plan. At the outset of the promulgation hearing it was considered that all handlers who sold any milk in the Cleveland area should be fully regulated. The proposed order that accompanied the notice of the promulgation hearing so provided. Full regulation under similar circumstances has received judicial approval. Titusville Dairy Products Co. v. Brannan, 3 Cir., 176 F.2d 332. Cf. United States v. Rock Royal Cooperative, Inc., supra. At the hearings, however, it was shown that full regulation of such non-pool handlers would subject them to an unwarranted burden of payments and assessments and place them at a severe

competitive disadvantage with other non-pool handlers in the sale of milk in non-regulated areas. Accordingly, it was determined that the alternative of partial regulation of non-pool handlers who distributed 10% or less of their milk in the regulated area would subserve the purpose of protecting the basic plan of regulation and be equitable to such non-pool handlers. Such alternative was incorporated in Section 975.72(A) of Order No. 75. The provisions of this section of the Order are not inconsistent with subsections (5)–(7) of 608c of the Act and being designed to preserve the integrity of the basic plan they must be regarded as incidental and necessary "to effectuate the other provisions of the Order." It should be noted that in Kass v. Brannan the alternative of full regulation was not present. Kass purchased milk products from another handler. He made no purchases of milk from farmers who could have been brought within the ambit of full regulation under Order 27 as producers.

It is held, therefore, that Section 975.72(A) is authorized by law.

Are the Provisions of Section 975.72(A) of Order 75 Supported by the Evidence?

As shown above, the payments required of a non-pool handler selling less than 10% of his volume of milk in the Cleveland area are based upon the difference between the Class I price of fluid milk and the Class III price of milk. When the plan of so-called partial regulation was adopted as an alternative to full regulation of such non-pool handlers, the above formula as to the rate of payments was the only one proposed by witnesses at the promulgation hearing. There was abundant evidence that there were Class III uses of milk in the Cleveland Milk Shed and neighboring areas. It was shown also that a similar formula had been incorporated in the Boston, Massachusetts Order. Plaintiff assails the formula as being predicated upon the assumption that a non-pool handler's initial cost of fluid milk is no greater than the Class III price whereas the evidence demonstrates that the average initial cost to plaintiff was in excess of both the uniform blend price and the uniform Class I price of fluid milk under the Order. Plaintiff's argument is premised upon the holding of the court in Kass that the initial cost of non-pool milk is a part of the minimum class prices authorized by Section 8c(5) (A) of the Act. However, such minimum prices apply only to classified milk, i. e.—milk purchased from producers. During the period in question plaintiff made no purchases from "producers" as that term is defined by Order No. 75 and which, as thus defined, means a dairy farmer whose milk "is moved directly from his farm to a pool plant." Section 975.8. To apply the principle of uniformity as announced in Kass would mean that any non-pool partially regulated handler whose initial cost was equal to or greater than the uniform Class I price could sell fluid milk in the marketing area without making any compensatory payments. The application of the Kass principle of uniformity in cases where a non-pool handler's initial cost was slightly less than the uniform Class I price would enable such handler to sell his surplus milk in the marketing area as fluid milk upon the payment of a small differential bearing no relation to the loss sustained by producers. The uniform minimum prices of classified milk referred to in Section 8c(5) (A) of the Act take no account of the initial cost of milk. Such prices are based upon use values. A pool handler purchasing milk from a producer may, if he chooses, pay a premium above the minimum blend price to farmers, thus increasing his initial cost. However, if a pool handler pays a premium he is nevertheless required to account to the Producers Settlement Fund in the manner provided by the plan. The initial cost of milk to a pool handler which may be more than the blend price is not a part of any minimum class price. Nor is the initial cost of milk to a non-pool handler part of a minimum class price. The Judicial Officer was correct in not regarding the

evidence of plaintiff's initial cost as material to the issues. Minimum class prices have no application to milk purchased by a non-pool handler. It is erroneous, therefore, to suppose that the formula by which compensatory payments are computed is based in part upon a hypothetical initial cost to a non-pool handler equal to the Class III minimum price of milk.

■ The rate of payment formula rests upon an entirely different principle. It is designed to compensate producers for the loss of fluid milk sales occasioned by non-pool handlers' sales of fluid milk in the marketing area and thus assure the payment of minimum blend prices to producers. Except for its reliance on the principle of Kass plaintiff submits no argument and no evidence tending to show that the compensatory payments in question are unreasonable. At the hearing in the 8c(15) (A) proceeding defendant called John R. Hanson as an expert witness. Hanson testified at length, and stated that in his expert opinion the rate of payment here in question was reasonable, appropriate and necessary. At the close of his direct testimony, counsel for plaintiff said: "The petitioner does not necessarily agree with the argument advanced in the direct examination of this witness but we have no cross-examination."

I agree with the Judicial Officer that:

"Rule-making looks to the future and is experimental in nature, being subject to amendment as experience warrants. American Airlines, Inc. v. Civil Aeronautics Board, [89 U.S. App.D.C. 365], 192 F.2d 417. And, of necessity, rule-making often calls for forecasts and estimates. In the light of the expertise of the Secretary the evidence in the record could legally form the basis for the judgment of the Secretary reflected in the protested provision. Cf. Railway Express Agency v. Civil Aeronautics Board [100 U.S.App.D.C. 165], 243 F.2d 422."

■ Order No. 75 was promulgated by the Secretary on June 29, 1946. Whether the rate of the compensatory payments is supported by evidence must be determined in the light of the record before the Secretary at the time the Order issued. Plaintiff did not enter the Cleveland marketing area until December 1947. Nor does it appear that plaintiff's later entrance into the market area was anticipated at the time the Order was promulgated. If, as is now contended by plaintiff, the compensatory payments were unreasonable, that fact was known to plaintiff during the period in question. Yet plaintiff made no attempt, by securing an amendment to the Order, to have the amount of the payments reduced although it was fully informed of its right to seek such relief. In oral argument plaintiff's counsel said: "We are not saying that we should have a free ride or that any one should have a free ride." The above statement is hardly consistent with plaintiff's reliance upon Kass which, if followed, would require a determination that plaintiff ought not be required to make any payments. Plaintiff's case, therefore, comes down to an attack upon the rate of payment which, as indicated above, is supported by evidence and its reasonableness confirmed by expert testimony in the proceeding before the Judicial Officer. In this state of the case there is no basis for holding the contested provision of Order No. 27 invalid. It is not without significance that during the period of partial regulation, particularly in the years 1950 and 1951, plaintiff's sales of fluid milk in the Cleveland marketing area increased substantially. Furthermore, the Secretary has submitted evidence which is not disputed showing that if plaintiff were subject to full regulation as it lawfully might have been its payments for the period in question, including assessments, would have been more than $240,000 in excess of the amount paid by plaintiff under partial regulation.

■■ Although the defendant raised the defense of estoppel as a bar to the maintenance of this action the Judicial

Officer considered it unnecessary to rule upon that question. He also considered it unnecessary to rule upon the issue raised by defendant's pleading the two year Limitation of Action provision in Order No. 75. It is regrettable that these issues were not determined in the proceeding before the Judicial Officer. Absent such administrative determination, this Court is without authority to decide the unresolved issues. Nor does Section 8c(15) (B) of the Act authorize a remand of the case except where the Secretary's decision is reversed.

For the reasons hereinabove stated the decision of the Secretary on the merits is affirmed.

An order may be prepared in accordance with this Memorandum.